QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Frederick A. Lorig (Bar No. 057645)
  fredlorig@quinnemanuel.com
  Kevin Y. Teruya (Bar No. 235916)
  kevinteruya@quinnemanuel.com
  Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Plaintiffs Olivia Van
Iderstine and Mitch Oberstein, on behalf
of themselves and all those similarly
situated

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Olivia Van Iderstine and Mitch Oberstein, on behalf of themselves and all those similarly situated,<br><br>  Plaintiffs,<br><br>  v.<br><br>Live Nation Entertainment, Inc., and Ticketmaster LLC,<br><br>  Defendants. | CASE NO.<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................ 1

PARTIES ............................................................................................. 8

    A.    Defendants ................................................................ 8

    B.    Plaintiffs ................................................................ 11

JURISDICTION AND VENUE .......................................................... 11

ADDITIONAL FACTS ...................................................................... 11

    General Background on the Live Music Industry ........................ 11

    Defendants Have Dominance in Multiple Relevant Services Markets .......... 16

    A.    Primary and Secondary Ticketing Services ........................... 17

    B.    Concert Promotion Services ................................................ 28

    C.    Relevant Geographic Market ............................................. 32

    Defendants' Anticompetitive Practices Harm Competition in the Market for Primary Ticketing Services for Major Concert Venues ................................................................ 33

    Defendants Are Now Attempting to Monopolize (and Succeeding in Monopolizing) Secondary Ticketing Services for Major Concert Venues ................................................................ 42

    Defendants' Acts Have Had Far-Reaching Anticompetitive Effects That Damaged Plaintiffs in Direct and Quantifiable Ways ................. 48

ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT ................................. 55

CLASS ACTION ALLEGATIONS .................................................... 59

INTERSTATE TRADE AND COMMERCE ...................................... 61

CLAIMS FOR RELIEF ...................................................................... 62

PRAYER FOR RELIEF ...................................................................... 69

DEMAND FOR JURY TRIAL .......................................................... 70

COMPLAINT

**PRELIMINARY STATEMENT**

1.  Plaintiffs bring this class action against Defendants Ticketmaster LLC ("Ticketmaster") and Live Nation Entertainment, Inc. ("Live Nation Entertainment") under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, to recover the damages they suffered from paying supracompetitive fees on primary and secondary ticket purchases from Ticketmaster's online platforms.

2.  For decades, Ticketmaster and its predecessor, Ticketmaster Entertainment, Inc., has dominated primary ticketing services for live music events at major concert venues throughout the nation.[1]  Today, Ticketmaster has a market share exceeding 70% of primary ticketing services for major concert venues, which has come about in part by virtue of a web of long-term exclusive dealing agreements and various anticompetitive acts detailed herein, and provided Ticketmaster with decades of market dominance.  By Defendants' own count, Ticketmaster provides primary ticketing services to over 12,000 venues, with more added every year.  As the Department of Justice's Antitrust Division noted in 2010, and as public facts from subsequent litigation have demonstrated, there are high barriers to entry in the market for primary ticketing services for major concert venues, including, among other things, the long-term exclusive dealing agreements mentioned above.  These barriers and Defendants' many anticompetitive acts have assured that Ticketmaster's market power has long been (and remains) impregnable.  As a result, over 70% of tickets for major concert venues in the U.S. are sold through Ticketmaster's online platforms, despite that—as it has done for years—Ticketmaster charges supracompetitive fees made possible by its dominant market position.

3.  But Ticketmaster is not just a standalone company; it merged with Live Nation Entertainment in 2010 and today those entities jointly form the world's largest

---

[1]  "Primary" ticketing refers to the initial distribution of tickets for a show.  This is as compared to "secondary" ticketing, which refers to the resale of previously-purchased tickets, typically at a higher price.

COMPLAINT

and most powerful live music company.  In the United States alone, Live Nation Entertainment is by far the largest and most dominant concert promoter for major concert venues, with a roster of clients that includes the vast majority of top touring acts in the world.  And Ticketmaster provides the vast majority of ticketing for those top grossing tours, as the former Chief Economist of both the Federal Trade Commission and the Antitrust Division summarized in a recently-concluded lawsuit:

Figure 10. Ticketmaster's US share of Pollstar top 2015 North American tours

| PS tour rank | Tour | Share of events | Share of shows | Share of tickets sold | Share of total gross |
|---|---|---|---|---|---|
| 1 | TAYLOR SWIFT | 77.8% | 74.5% | 84.9% | 84.6% |
| 2 | KENNY CHESNEY | 77.1% | 74.1% | 82.2% | 82.0% |
| 3 | GARTH BROOKS | 66.7% | 72.0% | 74.2% | 71.7% |
| 4 | THE ROLLING STONES | 85.7% | 85.7% | 85.3% | 87.4% |
| 5 | KEVIN HART | 87.2% | 89.8% | 88.9% | 88.8% |
| 6 | U2 | 85.7% | 92.9% | 94.3% | 94.9% |
| 7 | ONE DIRECTION | 94.1% | 94.1% | 93.9% | 95.3% |
| 8 | LUKE BRYAN | 90.7% | 88.3% | 90.0% | 88.1% |
| 9 | BILLY JOEL | 61.1% | 75.9% | 72.0% | 72.8% |
| 10 | SHANIA TWAIN | 66.7% | 66.7% | 66.0% | 67.8% |
| 11 | FLEETWOOD MAC | 76.3% | 76.9% | 76.4% | 76.2% |
| 12 | JUAN GABRIEL | 82.8% | 80.0% | 80.2% | 78.8% |
| 13 | AC/DC | 75.0% | 75.0% | 73.0% | 72.1% |
| 14 | GRATEFUL DEAD - "FARE THEE WELL" | 100.0% | 100.0% | 100.0% | 100.0% |
| 15 | TRANS-SIBERIAN ORCHESTRA | 73.3% | 73.0% | 74.0% | 73.4% |
| 16 | ZAC BROWN BAND | 88.9% | 86.0% | 81.3% | 76.7% |
| 17 | CIRQUE DU SOLEIL'S KURIOS | 50.0% | 49.5% | 47.1% | 48.9% |
| 18 | MAROON 5 | 84.6% | 85.7% | 86.7% | 84.5% |
| 19 | MADONNA | 84.6% | 85.7% | 88.1% | 89.0% |
| 20 | ELTON JOHN | 64.7% | 22.4% | 44.4% | 35.6% |
| 21 | CHRIS BROWN | 88.9% | 88.9% | 90.9% | 87.8% |
| 22 | DAVE MATTHEWS BAND | 91.7% | 90.9% | 91.7% | 91.8% |
| 23 | DEF LEPPARD | 82.7% | 82.7% | 85.2% | 80.6% |
| 24 | FOO FIGHTERS | 82.1% | 78.1% | 77.8% | 76.7% |
| 25 | ED SHEERAN | 71.9% | 68.6% | 70.7% | 70.2% |

Note: "Events" are defined as a single headlining act performing at a single venue over consecutive dates; an "event" can have multiple "shows," which are individual performances by that headlining act (i.e., Irish rock band U2 putting on a three-night run at the United Center in Chicago is an "event" consisting of three "shows").

4.     Subsidized by the supracompetitive profits Ticketmaster's business generates from its domination of primary ticketing services for major concert venues, Live Nation Entertainment is able to keep a stranglehold on concert promotion services—losing tens of millions of dollars annually—by paying its clients exorbitant amounts.   Using its promotion business as a loss leader in turn helps maintain Ticketmaster's dominance, because venue operators must take into account the very real possibility that Live Nation Entertainment will not route tours through their venues if they do not select Ticketmaster as their primary ticketing service provider.  And, as the U.S. Department of Justice's Antitrust Division recently revealed in public filings, this possibility was not just theoretical.  Since shortly after Live Nation Entertainment and Ticketmaster merged in 2010, Defendants regularly threatened venues with less (or no) Live Nation Entertainment tours if they did not select Ticketmaster as their primary ticketing service provider.  The practice was apparently so pervasive and insidious that, as the DOJ put it, "venues throughout the United States have come to expect that refusing to contract with Ticketmaster will result in the venue receiving fewer Live Nation concerts or none at all.  Given the paramount importance of live event revenues to a venue's bottom line, this is a loss most venues can ill-afford to risk."  This practice—which was, until recently, invisible to concert-going consumers, because consumers had no reason to know how venues contract for primary ticketing services, and because Defendants affirmatively concealed the behavior—went unchecked for so long that Defendants recently became brazen in their conduct.   Live Nation Entertainment's CEO and President, Michael Rapino, publicly admitted (on information and belief, for the first time) in September 2019 that, if a venue wants to use a ticketing service provider other than Ticketmaster, the venue "won't be the best economic place anymore because we don't hold the revenue."  In other words, Mr. Rapino indicated that, consistent with the DOJ's recently-made-public factual findings, Live Nation Entertainment would not route tours through that venue in the future

1  because Ticketmaster does not provide primary ticketing services there.  This threat

2  was not lost on any serious industry participant.

3       5.     The combined Live Nation/Ticketmaster behemoth has enormous, and

4  unique, market power in primary ticketing and concert promotion services, and has

5  shown it is unafraid to use that power.  Furthermore, the public evidence indicates, ever

6  since the 2010 merger, Ticketmaster acted under Live Nation Entertainment's direction

7  and control, including Mr. Rapino in particular, with respect to the anticompetitive acts

8  alleged herein.  Live Nation Entertainment also provided substantial, independent

9  assistance to Ticketmaster's anticompetitive acts.  As the DOJ recently put it,

10  Defendants' anticompetitive acts mean that, today, "many venues are effectively

11  required to contract with Ticketmaster to obtain Live Nation concerts on reasonable

12  terms, limiting the ability of Ticketmaster's competitors to compete in the primary

13  ticketing market and harming venues that would benefit from increased competition."

14       6.     But the anticompetitive harm and costs from Defendants' acts are not

15  shouldered by concert venues; consumers have that unenviable privilege, simply

16  because they want to see their favorite artists perform live.  Fans nationwide have long

17  decried the extraordinarily high fees Ticketmaster imposes on the tickets it sells, a

18  practice consumers cannot avoid because of Ticketmaster's ubiquity and impregnable

19  market power.  As publicly-available evidence, including a recent report from the

20  United States Government Accountability Office ("GAO"), shows, markets that are not

21  encumbered by Ticketmaster's monopoly over ticketing services demonstrate much

22  lower prices for consumers.  The GAO noted, for example, that while service fees for

23  U.S. venues the GAO analyzed averaged 22% and could go as high as 38%, "[i]n the

24  United Kingdom, where the venue and promoter typically contract with multiple ticket

25  sellers, ticket fees are lower than in the United States—around 10 percent to 15 percent

26  of the ticket's face value, according to a recent study."  Similarly, according to a report

27  from the New York Attorney General, at least as many as 65% of major concert venue

28  seats are now sold by Ticketmaster (and all with service fees far beyond what would be

-4-

1  paid in a competitive market).

2      7.     Despite the consumer harms they cause, Defendants have continued to

3  flourish by engaging in anticompetitive exclusive dealing with major concert venue

4  operators (which are bolstered by Ticketmaster's relationship with Live Nation

5  Entertainment), as well as numerous other unfair and anticompetitive acts discussed

6  herein that are aimed at eliminating and/or minimizing all competition, both in primary

7  ticketing services and, more recently, secondary ticketing services.

8      8.     Among those other predatory acts that collectively form its scheme,

9  Defendants have improperly wielded the conditional copyright license Ticketmaster

10  employs to grant access to its online platform as an anticompetitive weapon against all

11  users on the site.  According to the license's terms, Ticketmaster website users cannot

12  engage in a long list of practices aimed at purchasing a large number of primary tickets

13  at once, including through the use of, *inter alia*, multiple user accounts and "bots."  If

14  they do, then Ticketmaster states it may revoke the license to use its website and ban

15  users, or put them toward the back of the line in terms of ticket purchasing priority (*i.e.*,

16  electronically slow down their ability to purchase primary tickets).  Defendants claim

17  this is a pro-consumer conditional license but, the truth is it shows the lengths to which

18  Defendants will go to stifle competition.

19      9.     In reality, Ticketmaster's conditional license is a tool to maintain its

20  monopoly power in primary ticketing services for major concert services, as well as

21  extend and leverage Ticketmaster's monopoly power into secondary ticketing services

22  for major concert venues, which it is attempting to monopolize just as it has already

23  monopolized primary ticketing services for major concert venues.  Defendants were

24  recently caught red-handed telling consumers they are fighting ticket brokers (via the

25  conditional license and other means) when they were actually using the license as a

26  bludgeon to force secondary ticket brokers into agreeing to exclusively use

27  Ticketmaster's secondary ticketing platform, rather than other competing secondary

28  ticket platforms, for their resales.

10.     In addition to using the conditional license as an anticompetitive bludgeon, Defendants have also begun using their dominance over primary ticketing services to limit primary purchasers' ability to transfer tickets, unless those purchasers resell their tickets through Ticketmaster's secondary ticketing platform.  Defendants do so through mobile ticket technology, which delivers a ticket to a purchaser's smartphone.  Historically, primary ticket purchasers have been able to transfer their tickets to whomever they want.  They could resell their tickets on a competing secondary ticketing platform and then transfer their tickets to the secondary purchaser free of charge.  Now, however, Defendants have implemented technology that prevents such transfers, but still permits primary purchasers to resell their ticket on Ticketmaster's platform.  Primary purchasers are unaware of these restrictions when purchasing their tickets, and then have no choice in which platform to use if they wish to resell their ticket.

11.     Competing secondary ticketing service providers offer lower fees to secondary ticket purchasers than Defendants offer, which should create higher demand for secondary tickets sold on those other platforms (thus benefiting the ticket resellers).  However, those secondary ticket competitors simply cannot compete with Defendants' unique combination of concert promotion and ticketing services (and Defendants' collective dominance).  Thus, competing secondary ticketing service providers are at a distinct disadvantage in trying to simply compete on the merits.

12.     Given these problems, Defendants' use of the conditional license as an anticompetitive weapon, as well as their limitations on primary ticket transferability, have had anticompetitive effects for both primary and secondary ticketing services.  Among other effects, one effect is to grow Ticketmaster's secondary ticketing service business at the expense of its rivals (which provide the competing secondary ticket platforms on which brokers can opt to sell their purchased tickets), but not because Ticketmaster offers a better or cheaper service.  Another effect is to dramatically increase Ticketmaster's revenues by allowing it to levy fees on the second (and third,

etc.) sale of the same ticket(s) it sold in the primary sale. Ticketmaster has leveraged these effects into massive growth for its secondary ticketing service business, which has come at the expense of consumers because it has led to ever more supracompetitive ticketing fees for both primary and secondary ticketing services at major concert venues. That is a third effect of Defendants' conduct. On information and belief, Defendants' misuse of the conditional license alone has, like the recently-revealed information from the DOJ's investigation, continued for years and had substantial negative effects on competition in the markets for primary and secondary ticketing services, which has led to higher prices for both secondary *and* primary ticket purchasers on Ticketmaster's platform. When combined with the remainder of their bad acts, the harm is even more substantial for all types of ticket purchases.

13. Defendants' anticompetitive scheme has been wildly successful and today threatens to put nearly all ticketing services for major concert venues (primary and secondary) in the United States under Ticketmaster's monopolistic thumb. Ticketmaster's dominance in primary ticketing services remains unchecked, and that dominance becomes ever more impregnable with each passing year due to Defendants' exclusive dealing, tying, and other anticompetitive conduct. Similarly, fed by the anticompetitive acts described herein, Ticketmaster's secondary ticketing volume has seen remarkable, double-digit year over year growth for multiple years now, threatening to soon make Ticketmaster the largest secondary ticketing platform in the nation. This is despite that Ticketmaster has clearly engaged in blatant, anti-consumer behavior for years. In addition to its behind-the-scenes efforts to feed ticket brokers huge amounts of supply if they sold on Ticketmaster's secondary platform, the DOJ recently needed to move to extend the consent decree it originally crafted to permit the Live Nation Entertainment-Ticketmaster merger, because Defendants—as has only recently become public to ticket-buying consumers—shamelessly violated its terms for years. The FTC also intervened in recent years to prevent Ticketmaster from moving concert ticket buyers from its primary to secondary platform (*i.e.*, by implying tickets

offered at much higher prices than their face value were primary, as opposed to secondary, ticket sales).

14.     Defendants' predatory acts have increased and today threaten the entirety of competition within the primary and secondary ticketing services markets.  Michael Rapino, Live Nation Entertainment's CEO and President, has admitted that artists today make 95% of their income from live music events and that Live Nation is now the "largest single financer" of artists worldwide (more than record companies).  Armed as he is with this power over artists' careers, and fueled by Ticketmaster's outsized profits, Mr. Rapino has used this position to intimidate the live music industry into using Ticketmaster for primary ticketing services and, more and more, secondary ticketing services.  He and the Live Nation monster he has helped create over the past decade-plus must be stopped.

15.     This Complaint details Defendants' violations of the U.S. antitrust laws. Defendants are dominant in three relevant markets – (1) primary ticketing services for major concert venues (¶¶ 45-58, 63-65), (2) secondary ticketing services for major concert venues (¶¶ 59-65), and (3) concert promotion for major concert venues (¶¶ 66-72).   Defendants have engaged in predatory and exclusionary conduct (1) to monopolize the primary ticketing services market (¶¶ 79-89) and (2) to extend their dominance into the secondary ticketing services market (¶¶ 90-106).  Defendants' anticompetitive conduct has lessened, if not eliminated, competition and harmed consumers, including both the Primary and the Secondary Ticketing Services Consumer Classes (¶¶ 107-16).  This lawsuit aims to put an end to Defendants' misconduct.

## PARTIES

### A.     Defendants

16.     Defendant Live Nation Entertainment, Inc. (formerly known as Live Nation, Inc.) is a Delaware corporation with its principal place of business at 9348 Civic Center Drive, Beverly Hills, California 90210.  Live Nation is the largest live entertainment company in the world, connecting over half a billion fans across all of its

-8-

platforms in 29 countries. Live Nation states on its website that it "annually issues over 500 million tickets, promotes more than 35,000 events, partners with over 1,000 sponsors and manages the careers of 500+ artists." Live Nation's 2019 revenues were approximately $11.5 billion, but approximately 50% of its adjusted operating income is attributable to its Ticketing division (*i.e.*, Ticketmaster), even though Ticketmaster represented only 13.4% of Live Nation's revenues.

17.    Defendant Ticketmaster LLC is a wholly-owned subsidiary of Live Nation Entertainment, Inc. Ticketmaster is a limited liability company organized and existing under the laws of Virginia with its principal place of business at 7060 Hollywood Boulevard, Hollywood, California, 90028. Ticketmaster LLC is the successor in interest to Ticketmaster Entertainment, Inc., a Delaware corporation, and is the largest ticketing company in the United States, with 2019 revenues of approximately $1.54 billion. As discussed herein, Ticketmaster's business includes two main arms: its legacy primary ticketing services business and a newer, but increasingly-dominant, secondary ticketing service business. On information and belief, Ticketmaster's share of secondary ticketing services for major concert venues in the U.S. already exceeds 60%. Ticketmaster also has several additional divisions that provide ancillary services to these ticketing businesses. In performing the anticompetitive acts herein alleged, Ticketmaster acted under the direction and control of, and in coordination with, Defendant Live Nation Entertainment, and its senior-most executives.

18.    Live Nation Entertainment and Ticketmaster merged in an all-stock transaction in 2010. Since then, the resulting conglomerate reorganized into the following three segments:

(a)    In the Concerts segment, Live Nation Entertainment acts as a promoter. It and AEG Live are the only promoters that can operate on a United States national and global scale; the remainder of its competitors are purely local in nature. Live Nation Entertainment often serves as the exclusive promoter for artists on national tours, and uses cross-collateralization across concerts and its deep pockets, including

operating profits from its Ticketmaster and sponsorship divisions, to routinely offer artists higher guaranteed compensation than its only other national competitor, a company called AEG Live.[2]  Live Nation Entertainment has over 60% of the concert promotion services market.  Revenue streams from this segment are numerous and significant, but margins are below cost or very thin.  (Adjusted operating margins for 2019 were 2.6%.)  Live Nation Entertainment's promoted artists obtain the vast majority of the Concerts segment's revenue.

(b)     By contrast, the Ticketing segment (*i.e.*, Ticketmaster) is highly profitable with gross profit margins its own expert in a now-settled litigation stated exceeded 80%.  This division primarily consists of the legacy Ticketmaster business, which focuses on primary ticket sales, as well as a newer business focusing on secondary ticket sales (*i.e.*, ticket resales).  Ticketmaster sells tickets to the public under contract with the venues, and earns service and other ancillary fees on the sale of each ticket.  Ticketmaster also has a growing secondary ticketing marketplace, with over $1 billion of gross transaction value in 2019 (more than 50% growth since 2013).  This high-margin secondary ticketing business has provided an additional income stream for Ticketmaster on the same shows for which it sells primary tickets.  This means Ticketmaster can generate revenues two or more times on the exact same tickets.  Ticketmaster also maintains a database containing the contact information of over 130 million customers, a valuable resource that it has generally refused to provide to the very artists who create the demand that drives ticket sales.

(c)     The Sponsorship & Advertising segment leverages the 93 million or so fans Live Nation Entertainment draws to its shows, the 130 million-plus names in the Ticketmaster database, their stable of managed and promoted artists, and the venues

---

[2]   The Anschutz Entertainment Group (AEG) is an American worldwide sporting and music entertainment presenter and a subsidiary of The Anschutz Corporation. AEG owns a variety of major concert venues throughout the U.S. that compete with Live Nation- and third party-owned concert venues for major live music concerts.  AEG Live is AEG's promotion arm for live music concerts.

they control to sell targeted advertising to major companies.  In 2019, this segment generated adjusted operating income of $366 million on revenue of $590 million—a 62% operating margin.

19.    In 2019, the Ticketing and Sponsorship & Advertising segments generated only 18.4% of Live Nation Entertainment's revenues, but over ***100%*** of its adjusted operating income (reduced by its losses in Live Nation's concert promotion business, and its general corporate costs).

**B.    Plaintiffs**

20.    Plaintiff Olivia Van Iderstine is a resident of Los Angeles, California.  She purchased primary tickets and paid associated fees for primary ticketing services for events at major concert venues from Defendants' online platform within the class period.

21.    Plaintiff Mitch Oberstein is a resident of Los Angeles, California.  He purchased primary and secondary tickets and paid associated fees for primary and secondary ticketing services for events at major concert venues from Defendants' online platform within the class period.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiffs bring this action under Sections 4 and Section 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

23.    Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants sell tickets throughout the State of California, including in this judicial district.

## ADDITIONAL FACTS

### General Background on the Live Music Industry

24.    At a high level, the components of the live music entertainment industry include the following:

25.     Artists are the draw for a live music event and drive demand for the services of every subsequent link and participant in the live music industry chain.

26.     An artist manager serves as the "CEO" of an artist's business activities, advising in some or all phases of the artist's professional life (tours, appearances, recording deals, publicity, endorsements, etc.).  Managers often are compensated based on a share of all of the artist's revenues or profit streams.  Defendant Live Nation is currently the largest manager of artists in the music industry.

27.     The artist manager often hires booking agents to assist in arranging a concert event or tour.  The manager or booking agent contracts with promoters, such as Live Nation Entertainment, to secure payment terms for artists as compensation for their live performances.  Agents are typically paid a portion of an artist's receipts from live performances.

28.     The promoter is responsible for promoting the concert to the public, which requires several different types of work.  The promoter typically receives the proceeds from gross ticket receipts for each concert it promotes and is responsible for paying the artist, venue, and other expenses associated with the event.  For example, the promoter hires the artist for the performance (often guaranteeing more popular artists millions of dollars for that performance or a national tour), generally contracts with the venue (or uses its own venues), pays the concert venue operator a fixed fee (rental payment) to host the concert at the venue, arranges for local production services, and advertises and markets the concert.  The promoter bears the downside risk of an event if tickets sell poorly and reaps the upside benefit with the artists if tickets sell well.  Put simply, the more tickets a promoter is able to sell for a show, the more money the promoter (and artist) should make.

29.     Today, artists planning to conduct a tour at major concert venues often use a single company to provide and/or coordinate promotions for the entire tour.  SFX Entertainment, Live Nation Entertainment's predecessor company, was the first to achieve this feat at scale across the industry by acquiring multiple regional promoters and integrating them into one national organization.  The unique, nation-spanning services such a company provided to artists led them to view SFX (and, now, Live Nation Entertainment) as their promoter of choice for concert tours, large and small, particularly at major concert venues.  Although some artists still use multiple regional concert promoters for a single national tour, the pre-SFX *status quo* has been reversed, and this practice is now the exception, not the rule, for tours that include shows at major concert venues.  Defendant Live Nation Entertainment is the largest promoter in the United States, promoting over 60% of the shows at major concert venues in the nation.

30.     Concert venue operators provide access to and maintain the facilities where concerts are held and oversee the venue's associated services, such as concessions, parking, and security.  Along with a rental fee received from the promoter, venues generally take a share of the proceeds from concessions, parking, and artist merchandise sales.  Concert venues that contract with Ticketmaster have also, in recent years, begun to take a portion of the fees added to the face value of tickets for events at the venue (discussed further below).  Thus, similar to the promoter, the more tickets sold (and the more patrons that attend the venue), the more money the concert venue operator makes.

31.     In terms of ticket sales, concert venue operators have two options:  either manage the sale of primary ticket inventory themselves or contract with a third party to handle the sale process for them.  Managing and selling concert venue tickets is technologically and operationally complex, so most concert venue operators choose the latter option and contract with primary ticketing service providers (generally Ticketmaster for major concert venues) for comprehensive ticketing solutions.  Of

-13-

particular note for this Complaint is that, on information and belief, Live Nation Worldwide, along with other members of the Live Nation conglomerate, is the second-largest concert venue operator/owner in the United States and exclusively utilizes Ticketmaster for these services.[3]

32.     Primary ticketing service providers contract with venues to manage and sell primary ticket inventory for events at that venue.  Primary ticketing service providers create "back-end" inventory management systems and provide "front-end" support, including customer service, shipping, and fulfillment services, as well as the technology (and staff) to allow concert venue operators to sell tickets through their box offices.  The primary ticketing service providers provide primary ticketing services to primary ticket purchasers and sellers by acting as a distributor agent (distributing primary tickets from primary ticket sellers to primary ticket purchasers), and sell the primary ticket inventory made available to them through means such as the Internet, call centers, and retail outlets and/or help the venue sell tickets at its box office.

33.     Primary ticketing service providers generate profits by applying additional charges to the price of tickets sold to primary purchasers.  The overall price a consumer pays on a primary ticket purchase therefore generally includes the "face value" of the ticket (which is typically set by the artist and promoter),[4] as well as a variety of fees on top of/in addition to the face value of the ticket.  As noted, these fees are generally charged, received, and retained by the primary ticketing service provider, although they

---

[3]   Live Nation Worldwide, Inc. is a wholly-owned subsidiary of Live Nation Entertainment.  In addition to the venues it owns and/or operates, Live Nation Worldwide also runs the website livenation.com.  That website is separate and distinct from Live Nation Entertainment's website, livenationentertainment.com, and has a different purpose.  On livenation.com, Live Nation Worldwide sells tickets to events at venues it owns or operates, as well as for shows promoted by Live Nation Entertainment.  The only legal entity name actually listed on livenation.com, however, is Live Nation Worldwide, Inc.

[4]   In recent years, Ticketmaster has rolled out "dynamic pricing" services, which helps artists and promoters dynamically adjust ticket face values based on market demand for a particular show.  Thus, consumers attending the same show with roughly analogous seats may pay different face values for primary tickets based on when they purchase the ticket.

may be split with other parties, including the concert venue operator. Typically described as "convenience," "processing," "service," "facility," and/or "delivery" fees, these fees can constitute a substantial portion of the overall cost of the ticket to the consumer.

34.     Substantially all of the nation's major concert venues have entered into long-term exclusive agreements with primary ticketing service providers—well over 70% with Ticketmaster, and growing each year—whereby the ticketing service provider contracts for the exclusive rights to the majority of all ticket sales for all events held at the venue. By Defendants' own count, Ticketmaster provides primary ticketing services to over 12,000 venues and has a renewal rate "exceeding 100%," because there is no effective competition to Ticketmaster when these long-term exclusive dealing contracts expire.

35.     According to Ticketmaster, its agreements with concert venues have terms that may exceed ten or more years in length and are typically in the 5-7 year range. In order to induce concert venue owners/managers to enter into such exclusive dealing agreements, Ticketmaster offers up-front payments and other subsidies that can run into the millions of dollars that are conditioned on such exclusivity. Those up-front payments act as a barrier to entry for smaller competitors and act as an additional mechanism to maintain Ticketmaster's dominance.

36.     Once there is a primary ticket sale, the primary ticket purchaser typically may choose to resell their ticket. Historically, such "secondary" ticket sales (*i.e.,* resales) were challenging because it was logistically difficult to find a purchaser. Ticket holders wanting to sell their tickets were therefore typically relegated to either asking around to see if anyone they knew (or friends of friends) might want to purchase the ticket(s), selling to local ticket brokers or putting tickets on commission there, or heading to the event the day or evening of and selling to a scalper, who would then try to resell the ticket to passersby.

37.     In recent years, however, a market for secondary ticketing service providers also arose.  Such service providers typically offer online platforms connecting ticket resellers to ticket purchasers, and providing services to both by acting as a distributor agent (distributing secondary tickets from the former to the latter).  This substantially reduces the logistical difficulties of reselling tickets.  Today, selling a ticket is often as easy as posting the ticket on a secondary ticketing platform and waiting for a purchaser to locate and buy the ticket.

38.     Like primary ticketing service providers, secondary ticketing service providers do not set the price of the ticket; that decision is left up to the ticket seller.  Also like primary ticketing service providers, secondary ticketing service providers generate revenues by levying fees on the sale transaction.  However, unlike primary ticketing service providers, secondary ticketing service providers typically charges fees on both sides of the transactions, as opposed to just on the ticket purchaser.  A ticket seller therefore must pay a set fee (often a percentage of the "face value" they set for the ticket sale), and the purchaser must also pay a set fee (often, also a percentage of the sale price, as well as other assorted fees).

39.     Due to the conduct alleged herein, Ticketmaster's branded platform, as well as its TicketExchange, TicketsNow, TM+, and Verified Tickets secondary platforms have, on information and belief, obtained a market share exceeding 60% of secondary ticketing services for major concert venues and are now threatening to obtain (or have obtained) monopoly power in secondary ticketing services for major concert venues just as it currently has in primary ticketing services for major concert venues, where it has a market share exceeding 70%.

**Defendants Have Dominance in Multiple Relevant Services Markets**

40.     There are three relevant service markets applicable to this dispute.  They are:  (1) primary ticketing services for major concert venues; (2) secondary ticketing services for major concert venues; and (3) concert promotion services for major concert venues.  Defendants are dominant in all three markets.

**A.**     <u>**Primary and Secondary Ticketing Services**</u>

      **i.**     **Major concert venues constitute a distinct segment for ticketing services providers**

41.     A major concert venue is a facility suitable for hosting events of the most successful artists and the largest concert tours.  Due to popular demand for events featuring successful artists, major concert venues are likely to generate a larger volume of commerce (*e.g.*, ticket sales, merchandise sales, concessions) than other venues. Relative to other concert venues, major concert venues are also likely to have greater seating capacity and to be located closer to major metropolitan areas.  In terms of events, major concert venues must be suitable for hosting live music concerts, but may also be used for non-music performances (*e.g.*, sports) or for other events requiring large seating capacity.

42.     Ticketing service providers recognize that concerts require a specific type of ticketing service, and that major concert venues in particular require even more specialized ticketing services.  Regarding the former point, Ticketmaster internally categorizes concerts as a specific type of ticketing.  For example, in a previous lawsuit, Ticketmaster's Rule 30(b)(6) corporate representative testified that different types of venues are treated separately within the organization, and that "concerts" were one such category.  Ticketmaster's former CFO also testified that Ticketmaster breaks down tickets by category, one of which is "concerts."  Numerous Ticketmaster documents (made public in prior lawsuits) similarly note that concert ticketing is a category unto itself within Ticketmaster's broader ticketing services business including but not limited to the following:

COMPLAINT

1
2
3
4
5
6
7
8
9
10



Figure 1. Ticketmaster 2015 market shares by vertical segment

Source: Ticketmaster, "2015 NA Live Entertainment Market Sizing" (presentation, n.d.), 2 (TM00020328 at -332).

11    43.    Within the concerts ticketing services category, major concert venues

12  constitute a distinct segment.  Major concert venues host the industry's biggest acts.

13  Shows for super star artists sell out in minutes, bombarded by thousands of fans and

14  ticket brokers struggling to scoop up seats for top-tier performances.  As the US

15  Department of Justice discussed in its January 25, 2010 Competitive Impact Statement

16  on the Ticketmaster-Live Nation Entertainment merger, "major concert venues require

17  more sophisticated primary ticketing services than other venues."  The websites of

18  ticketing service providers that service these venues need to be equipped to handle

19  massive online traffic.  Such "high-demand events" have much higher requirements

20  than other types of events and have been likened to a "denial of service attack" by

21  industry insiders, meaning they receive heavy online traffic.

22    44.    Artists and their managers also recognize that major concert venues are a

23  distinct category within the live music ticketing space.  In previous litigation involving

24  Ticketmaster, one third-party deponent manager made clear that major concert venues

25  were distinct from minor venues, from an artist's perspective, and that ticketing for

26  such venues was largely centralized in one place (Ticketmaster; discussed further

27  below).  This view is echoed by industry publications, such as Pollstar, that distinguish

28  "major" concert venues from other venues within single categories, and even give out

1  awards based on whether a venue is "major" or not (*e.g.*, "Best Major Outdoor Concert
2  Venue").

3        ii.    **Ticketmaster has long dominated primary ticketing services**
4               **for major concert venues**

5        45.    As previously noted, Ticketmaster has dominated primary ticketing for
6  decades, dominance that has increased over the past four years in part because of the
7  merger with Live Nation Entertainment.  Other companies have sought to compete
8  against Ticketmaster for primary ticketing to concert venues over the years, but none
9  have been successful because Ticketmaster acquired them, drove them out of business,
10 or minimized their market share through a variety of tactics.  Indeed, as the DOJ
11 recently noted in moving to modify the Live Nation Entertainment-Ticketmaster
12 consent decree, "Ticketmaster has been the largest primary ticketing service provider
13 for major concert venues in the United States for at least three decades."  In 2017,
14 Ticketmaster's share of primary ticketing services in the United States exceeded 70%
15 among major concert venues and, as noted, its market power is growing as a result of
16 renewals and extensions of existing agreements.  Furthermore, Ticketmaster sells the
17 vast bulk of tickets for major concerts in the U.S. on an annual basis, because, as
18 detailed herein, Live Nation Entertainment promotes the great majority of major
19 concert tours each year and routes those tours through major concert venues for which
20 Ticketmaster is the primary ticketing service provider.

21       46.    High market shares are not the only indicators of Ticketmaster's market
22 power.  Ticketmaster's revenues are much greater than those of the next several largest
23 primary ticketing service competitors combined, as are, on information and belief, its
24 gross profit margins.  Moreover, although a small number of other primary ticketing
25 competitors attempt to compete against Ticketmaster for primary ticketing rights at
26 venues not controlled by Defendants, Defendants have admitted that Ticketmaster's net
27 renewal rate with venues on an annual basis has been "***over*** 100%."  In other words,

28

since it merged with Live Nation Entertainment, Ticketmaster has steadily increased its market share and dominance.

47. Live Nation Entertainment has long been the world's largest promoter of live concerts, boasting that it is "the global leader in live." Live Nation Entertainment's Concerts business segment principally involves the promotion of live music events at concert venues throughout the world, although its largest footprint is in the United States. Live Nation Worldwide, combined with other members of the Live Nation conglomerate, is also the second-largest owner or manager of concert venues and owns, leases, operates, has booking rights for, or has equity interests in over 200 live entertainment venues of various sizes in the United States.

48. Before their merger, Live Nation Entertainment had been using Ticketmaster as its primary ticketing service provider and was one of Ticketmaster's largest customers. In late 2006, Live Nation Entertainment (run then, as now, by Mr. Rapino) concluded that it would be better served by entering the ticketing service business itself. It believed that, as the nation's foremost concert promoter, its prominence would give it immediate access to the primary ticketing services market.

49. That is exactly what happened. Shortly after rolling out its primary ticketing service strategy in 2008—which involved (a) licensing ticketing software from CTS Eventim, the leading German primary ticketing service provider, for both Live Nation and third party venues to use within the United States, and (b) engaging in price competition with Ticketmaster on ticket service fees—Live Nation Entertainment became the second-largest provider of primary ticketing services in the United States almost overnight (by signing up both itself *and* the largest venue operator of the time, SMG).

50. In order to protect and preserve its monopoly power in primary ticketing services and to remove Live Nation Entertainment as a competitor, Ticketmaster decided to merge with Live Nation Entertainment. The U.S. Department of Justice, California, and sixteen other states disagreed that this was permissible and, in January

2010, sued to block the merger between Ticketmaster and Live Nation Entertainment. The primary concern expressed in the complaint was that the merger would eliminate competition and innovation in the market for primary ticketing services (defined in the complaint as "primary ticketing services"), by eliminating Live Nation Entertainment as a competitor of Ticketmaster.  (Regulators did, however, also express concerns that the merger would also provide Ticketmaster with dominance in the secondary ticketing service provider market as well.)  To reduce the government's concerns, Defendants entered into a consent judgment with numerous requirements, including several behavioral remedies (*i.e.*, remedies meant to prevent certain anticompetitive behaviors). One of those behavioral remedies was that the merged entity was prohibited from conditioning or threatening to withhold artist tour stops (which Live Nation sets as an artist's concert promoter) based on whether a venue selects Ticketmaster as its primary ticketing service provider.  In other words, the merged companies could not punish or threaten to punish venues with less concerts if the venue decided not to use Ticketmaster as its ticketing service provider.

51.     The consent decree, including its behavioral remedies, was set to expire this year, but the DOJ recently moved to extend the consent decree by five-and-a-half years, because Defendants engaged in multiple violations of the consent decree's behavioral remedies.  Those acts are discussed in further detail below.  As relevant here, the DOJ noted its motion was necessary because Defendants' acts had led to *further* domination by Ticketmaster in primary ticketing services—and, therefore, consumer harm during the class period.

52.     Using a widely-recognized measure of market concentration called the Herfindahl-Hirschman Index ("HHI"), the post-Live Nation Entertainment and Ticketmaster merger HHI for primary ticketing services for major concert venues increased by over 2,190 points, resulting in a post-merger HHI of over 6,900.  The U.S. Department of Justice considers any market with an HHI of more than 2,500 to be highly concentrated.  If Ticketmaster is successful in its quest to destroy competition in

the primary and secondary ticketing services markets, the HHI would rise even higher, to nearly single-competitor—*i.e.*, pure monopoly—levels.

53.     As discussed above, Ticketmaster is the largest primary ticketing services provider in the nation.  Ticketmaster has historically possessed multiple competitive advantages.  As a result, smaller primary ticketing service providers (of all types) have been limited in their ability to compete.

54.     The primary source of, and barrier surrounding, Ticketmaster's market dominance is a nationwide web of long-term, exclusive dealing contracts with the vast majority of major concert venues throughout the United States.  General sales under these contracts typically involve the sale of available tickets to the venue's shows, excluding artist presale allocations.  In exchange, Ticketmaster pays the venue a high fixed fee (often including undisclosed rebates and other subsidies), which, depending on the venue and the term of the contract, can be many millions of dollars.  Given the amounts at issue, this is a substantial barrier to entry and has allowed Ticketmaster to steadily grow its venue contracts since its merger with Live Nation.

55.     The long-term exclusive dealing contracts with venues also create market power and barriers to entry because of their length and ubiquity.  Ticketmaster's exclusive dealing arrangements with venues have terms that may range to ten or more years in length and presumably much longer for Live Nation-controlled venues.  According to published industry data, Ticketmaster controls the distribution for over 70% of major concert venues and works with over 12,000 venues total.  Published industry data also indicates that approximately 70% of all online concert ticket sales are completed through ticketmaster.com or Ticketmaster-run websites.

56.     Ticketmaster has also entered into long-term exclusive dealing arrangements with concert promoters, which is another barrier to entry and source of market power.  Live Nation Entertainment, the largest of these promoters, utilizes its subsidiary and agent, Ticketmaster, almost exclusively and actively seeks to dissuade its artists from using any other presale ticketing platform.

57.    In addition to Ticketmaster's exclusive contracts, new entry into the provision and sale of primary ticketing services is costly and time-consuming, thus constituting a substantial, additional barrier to entry.  A ticketing service provider must develop, maintain, and efficiently operate the required ticketing software and hardware computer systems, and possess the ability to demonstrate the reliability of its computer systems.  Moreover, for primary ticketing service providers in the current marketplace, the company must possess the ability to provide substantial up-front payments to customers.  Given these baseline requirements, no new entrant has developed or can develop the combination of comparable business characteristics and abilities in order to compete in primary ticketing services with the combination of Ticketmaster and Live Nation Entertainment.

58.    Ticketmaster's market power in primary ticketing services is evidenced by the high and supracompetitive fees that it charges for such services, and the restricted output those fees cause.  Ticketmaster's fees can collectively increase the price of a ticket to the consumer by 20-80% over the ticket's face value, which, in turn, generates gross profits (after all rebates and other payments) to Ticketmaster of over 80% according to Ticketmaster's own expert in an earlier case.  There are no effective constraints on Ticketmaster's ability to charge these supracompetitive fees because box office sales for most concerts and other events are minimal and are continuing to decrease.  This is because (a) in certain cases, Ticketmaster dictates that box office sales cannot begin until a specified time period following commencement of the online general sale (*e.g.*, for Madison Square Garden, box office sales are prohibited until one day after the general sale commences on ticketmaster.com), (b) consumers realize they have a better chance of obtaining a better seat online, and (c) consumers continue to increasingly prefer online purchases through mobile- or web-based applications.  As noted above, these factors also lead to restricted output in overall ticket sales, as is demonstrated by the fact that 40-50% of tickets to concerts at Ticketmaster-contracted venues go unsold every year.

COMPLAINT

       **iii.**      **Ticketmaster is attempting to extend, or has extended, its monopoly power to secondary ticketing services for major concert venues**

59.    As discussed above, secondary ticketing services help facilitate the resale of tickets, and they provide a distinct role in the live music industry.  Similar to online auction websites like eBay, a secondary ticketing service provider creates an online platform that allows ticket holders to post their ticket(s) for sale.  The ticket holder/seller determines the sale price for the ticket.  The secondary ticketing platform then provides potential purchasers with search capabilities to locate tickets for events they want to attend.  If a purchaser decides they want to buy one or more tickets for sale on the platform, they fill in their purchase information and the platform completes the sale.  Typically, the secondary ticketing service provider charges both the seller and purchaser fees, usually based on the sale price of the ticket(s).

60.    Within the live music industry, and among concertgoers nationwide, there is broad recognition that primary and secondary ticketing services are distinct.  Live Nation Entertainment's CEO, Mr. Rapino, for example, has been repeatedly quoted discussing the difference between the two types of service, including noting that Ticketmaster has grown its secondary ticketing services substantially over the past several years.[5]  Industry sources also regularly recognize the clear difference between such services, and secondary ticketing service providers are listed and grouped as a distinct category of provider, although there is some overlap between the companies that provide such services.

61.    Several other factors also demonstrate the unique and separate nature of secondary ticketing services (as opposed to primary ticketing services) for major concert venues:

---

[5]  This growth has occurred *in addition to*, rather than instead of, growth in primary ticketing services, because Defendants' goal is to maximize revenue from primary ticketing services and then grow revenue by *also* selling those same tickets via Ticketmaster's secondary ticketing service platform.

(a)    *First*, customers for secondary ticketing services (*i.e.*, secondary ticket sellers and purchasers) recognize the distinction between secondary ticketing service providers and primary ticketing service providers.  In fact, primary ticketing service providers themselves (including Ticketmaster) all view secondary ticketing services as separate and distinct from primary ticketing services.  Defendants' own public materials clearly make this distinction.   For example, in Live Nation Entertainment's most recent SEC Form 10-K disclosure statement, Live Nation Entertainment repeatedly distinguishes between "ticketing services" and "ticketing resale services," noting that the former is for venues and the latter for resellers, and that the services they each provide are different.  That same disclosure also distinguishes between "primary ticketing companies" (also referred to as "primary ticketing service providers") and "secondary ticketing companies."   So, too, does the disclosure repeatedly distinguish between primary ticket sales and the "secondary ticket sales market."  Other public analyses of the ticketing industry also regularly sort primary and secondary ticketing service providers into different categories.

(b)    *Second*, all entities involved in the live music industry (including Defendants themselves) recognize that secondary ticketing services have unique purposes from primary ticketing services:  the latter are meant to facilitate and run the original sale of tickets on a venue's behalf, and the former are meant to facilitate ticket purchasers' resale of their ticket(s) at a later date.

(c)    *Third*, the customers for secondary ticketing services for events at major concert venues are distinct from the customers for primary ticketing services for events at major concert venues.  For primary ticketing services, major concert venue operators are the ticket sellers who retain primary ticketing service providers to act as their distributor agent and provide a number of back-end and front-end services to sell tickets directly to fans wishing to attend an event.  For secondary ticketing services, the ticket sellers are purchasers who bought a ticket and now wish to resell that ticket.  The ticket buyers who utilize the two types of ticketing services are also distinct, in that the

secondary ticket buyers are purchasers who were unable to obtain the ticket they wanted from the primary ticketing service provider, and therefore needed to look for resale options instead.

(d)      *Fourth*, there are distinct pricing models between the two ticketing service markets. Primary ticketing service providers generate profits by levying fees on top of a ticket's face value. That face value is not established by the venue operator (*i.e.*, the ticket provider), but rather by the artist and their promoter. The venue operator does not pay primary ticketing services fees—primary ticket purchasers do—and, due to recent changes in Ticketmaster's business model, now often shares in a portion of the levied fees, including by helping set the fee levels. Secondary ticketing service providers also generate profits by levying fees on secondary ticket sales, but that is where the similarity ends. Unlike in the primary market, secondary ticket prices are set on a ticket-by-ticket basis by the ticket seller (as opposed to by the artist and the artist's promoter). Moreover, unlike in the primary market, a secondary ticketing service provider typically charges the *ticket seller* a fee, often a percentage of the sale price of the ticket. However, secondary ticketing service providers *also* charge the purchaser one or more fees on the sale, thus obtaining profits from both sides of the transaction.

(e)      *Fifth*, demand for secondary ticketing services is not sensitive to changes in prices for primary ticketing services, because such changes do not cause secondary purchasers to choose a different set of services. It is irrelevant to secondary ticket sellers and purchasers whether the prices primary purchasers pay for a venue's primary ticketing service provider (*i.e.*, the fees those primary ticket purchasers pay on top of a ticket's face value) change in any real way. What matters for the secondary market customers is that they have a service available to post and potentially find (and purchase) a resale ticket.

(f)      *Sixth*, there are specialized vendors that are largely distinct between the primary and secondary ticketing service markets, and the platforms they provide are substantially different, depending on the ticketing service involved. For primary

ticketing service providers, the platform is venue-specific, and the services provided are aimed at facilitating a sale of primary tickets—which often includes the high-volume rush once tickets go on sale—as well as providing on-the-ground ticketing services at the actual event (*e.g.*, employees scanning tickets at the door). For secondary ticketing service providers, the vendor must instead provide a platform with very different services and functionality. A secondary platform focuses more on connecting sellers and purchasers, and also providing the necessary capabilities to complete their ticket transaction. The secondary ticketing service provider takes a fee for its platform, but is not the one actually conducting and setting forth the terms of the sale.

62. In the secondary ticketing services for major concert venues market, which is a distinct market for the same reason that primary ticketing services for major concert venues is a distinct market (*see supra* pages 24-27), Ticketmaster has a very small number of substantial competitors. On information and belief, along with Ticketmaster, those few secondary ticketing service providers control the vast bulk of the secondary ticketing services for major concert venues market, such that eliminating them via the acts described herein would give Ticketmaster well over 70-80% of the market.

> **iv.    Ticketmaster uniquely has substantial and increasingly dominant market share in both the primary and secondary ticketing services for major concert venues markets**

63. As noted above, Ticketmaster provides both primary and secondary ticketing services for major concert venues. Ticketmaster is unique, however, in that it is the only ticketing services provider in the nation to have substantial share of both markets. Most of Ticketmaster's ticketing service competitors for major concert venues operate in one or the other market, and only a very small handful operate in both. For the latter group, however, the few competitors in that category focus primarily on one of the two relevant markets and have only a small presence in the other.

64.     Based on public information, Ticketmaster currently controls over 70% of the primary ticketing services for major concert venues market, and, on information and belief, over 60% of the secondary ticketing services for major concert venues market. No other companies even remotely approach Ticketmaster's share of either market, and the elimination of either would lead to Ticketmaster controlling nearly the entire respective market.

65.     As the above indicates, Ticketmaster's unique dominance in both categories of ticketing services has broad implications in the live music industry.  If one were to assume, for example, that primary and secondary ticketing services for major concert venues were simply part of a single ticketing services market, Ticketmaster would *still* have monopoly power.  The GAO recently noted that the primary ticketing services market in the United States is larger than the secondary ticketing services market.  On information and belief, Ticketmaster's dominance in primary ticketing services and its ever-growing share of secondary ticketing services therefore means that it would still have well over 60% of a hypothetical combined ticketing service market for major concert venues.  Furthermore, as Ticketmaster's pricing practices and admitted growth strategies in both types of ticketing services shows (*i.e.*, it attempts to maximize revenues in both types of services and does not view one type of service as cannibalizing the other), it has monopoly power even if one assumes a combined services market.  In that alternative view of the market, its actions alleged herein are thus an example of anticompetitively obtaining and maintaining monopoly power, as well as attempting monopolization, in a single market rather than two separate markets. No matter how one views the markets, Defendants' conduct is inherently problematic for competition.

**B.     <u>Concert Promotion Services</u>**

      **i.     Live Nation Entertainment is the unquestioned leader in concert promotion services for major concert venues**

66.     On information and belief, Live Nation Entertainment controls at least

60% of concert promotion services for major concert venues.  AEG Live is Live Nation Entertainment's closest competitor, with roughly 20% of the market.  Live Nation Entertainment, however, promotes the vast majority of the top grossing touring acts in the world (who tour almost exclusively at major concert venues), and it is the only promoter, national or regional, that has a direct corporate relationship with the nation's most dominant concert venue and artist presale ticketing service provider, Ticketmaster.

67.    As discussed above, Live Nation Entertainment is the largest concert promoter in the nation and the world.  Live Nation Entertainment has distinct competitive advantages as compared to AEG Live, the second largest concert promoter for major concert venues.  Neither AEG Live nor any likely entrant to the concert promotion services market possesses the combination of attributes to prevent Live Nation Entertainment's selective exercise of market power over artists and major concert venues by the merged firm.  New entry into the provision and sale of concert promotion services at the scale of Live Nation Entertainment is costly and time-consuming.  Promoters for major concert venues must have the ability to provide substantial up-front payments to artists, and artists seeking to conduct a concert tour, particularly a national tour in the United States that includes major concert venues, require employees with the expertise, contacts, and business acumen to organize and promote such a tour (and with particularized knowledge of how to promote at such venues).  Furthermore, given that a United States concert tour of major concert venues is specifically tied to the venues and regions in which it is conducted, and requires specialized knowledge and skills regarding those venues and regions (among other related factors), artists require that concert promotion services be provided in the United States by service personnel located in and throughout the United States.  It would take a prospective new entrant a substantial investment of money and over multiple years to develop the combination of comparable characteristics necessary to compete with the merged firm in concert promotion services and, even then, there is no assurance that it could in any way reduce Live Nation Entertainment's market power.

68.     For nearly two decades, Live Nation Entertainment has dominated concert promotion services overall.  It has maintained its dominance by virtue of its size and scope, and anticompetitive and unfair business tactics, including acquisitions of competing promoters, and incurring losses via significant overpayment to artists from tour revenues with the aim of reducing rival promoters' access to clients.

69.     Additional entry barriers to Live Nation Entertainment's concert promotion dominance have also emerged since it merged with Ticketmaster, because Ticketmaster provides the bulk of the merged firm's annual operating income.  With that income stream from Ticketmaster, Live Nation Entertainment is able to offer higher payments to artists than AEG Live and other concert promoters, and to use its promotion business as a loss leader to generate outsized profits for its ticketing and sponsorship businesses.  In 2019, for example, Live Nation Entertainment reported in SEC filings that its promotion business operated at a $53 million dollar loss.  In the same period, Ticketmaster generated nearly $232 million in operating income.

70.     Live Nation Entertainment's ability to price concert promotion services in this way—losing money year after year after year—yet nevertheless ensure massive profits for the overall company is one of the reasons why Live Nation Entertainment has durable market power over its smaller competitors.  Armed with that unique pricing ability, Live Nation Entertainment has only grown its market share and power without fear of serious competition.  Live Nation Entertainment has also recently acquired most of largest annual festivals in the United States, which provides the Live Nation conglomerate yet more leverage over the entire live music industry.

71.     Live Nation Entertainment's market power is also supported by current trends in the music industry.  Whereas, in previous decades, revenues from recorded music were musicians' main source of income, with touring revenues providing a smaller income stream, those statistics have since reversed themselves.  This reversal is largely due to the advent of modern music streaming and download technologies, and it requires artists to place much more emphasis on the touring portion of their careers.

This reality has greatly increased Live Nation Entertainment's power and control over the shape of artists' careers, making them more reluctant than ever to defy Live Nation Entertainment more broadly, including by selecting a different promoter and/or planning tours that try to focus on non-Ticketmaster-controlled major concert venues (to the extent that is possible, which, for tours in the United States, it is not). Indeed, Mr. Rapino has admitted that artists today make "about 95%" of their income from live music events and that Live Nation is now the "largest single financer" of artists worldwide (more than record companies).

72. Live Nation Entertainment holds over 60% of the concert promotion services market and promotes at least 80% of the top-billing global touring acts, which tour the United States. Within the last four years, Live Nation Entertainment has used its market dominance to aid its subsidiary Ticketmaster in its efforts to destroy rivals (discussed further below).

### ii. Live Nation Entertainment and Ticketmaster's combined dominance is unique in the live music industry

73. Since they merged in 2010, Defendants have, both individually and as a conglomerate, acquired unparalleled dominance within the live music industry. Ticketmaster provides the vast bulk of primary ticketing services in the United States, just as it has for decades. Whereas, pre-merger, Ticketmaster needed to be cognizant of promoters and artists taking business away from Ticketmaster's contracted venues, that concern has now disappeared because the post-merger Live Nation Entertainment business promotes, manages, and/or hosts concerts for most of the biggest acts that tour in the United States—*i.e.*, the artists that Ticketmaster and its venue clients most care about. Indeed, as herein alleged, Live Nation Entertainment has directly participated in, encouraged, aided, and facilitated Ticketmaster's anticompetitive activities.

74. Defendants' unique position in the live music industry also creates numerous entry barriers that protect and extend Ticketmaster's dominance. Live Nation Entertainment's promotion and artist management businesses, for example,

provide a steady stream of business to Ticketmaster and its venue clients that smaller ticketing companies cannot overcome.  Over a decade ago (*i.e.*, pre-merger), Live Nation Entertainment began to challenge Ticketmaster's dominance by using its stable of artists as an inducement to venue operators to select its own primary ticketing services over Ticketmaster's.  Without that constraint in the market—and with Live Nation Entertainment's now decade-long, perfect alignment with the company against which it previously sought to compete—Ticketmaster has only grown its market share and ability to set prices without fear of serious competition from any new entrant. Ticketmaster notably admits it is renewing over 100% of its long-term exclusive dealing contracts each year, which necessarily occurs at the expense of rivals. Ticketmaster has also, within the past four years, sought to extend this monopoly power to secondary ticketing services.

75.    In addition to barriers to entry based on the current market structure and conditions (including Defendants' corporate structure), Defendants' anticompetitive practices, discussed herein, including but not limited to tying agreements, long-term exclusive dealing contracts, vertically-arranged boycotts of various third parties against Ticketmaster's competitors, and coercion of and threats against disloyal customers and others, also act as a barrier to entry.

## C.    <u>Relevant Geographic Market</u>

76.    The United States is the relevant geographic scope of both ticketing service markets.  Concert venue operators purchase primary ticketing services from their locations within the United States and look to United States-based service providers to provide the primary ticketing services for their shows.  Similarly, secondary ticketing service providers provide platforms connecting purchasers throughout the United States.  Furthermore, only ticketing service providers with one or more locations in the United States compete with each other for customers requiring ticketing services at concert venues in the United States or for United States-based concert tours.

77.     The geographic scope of the market for concert promotion services for major concert venues is the United States.  Artists look to concert promotion service providers that operate within the United States in order to put on any leg of a concert tour stopping at a major concert venue in the United States.  Live Nation Entertainment and AEG Live have promotion networks established throughout the country and are considered viable alternatives to promoters with a more regional focus.  Accordingly, even if an artist is focused on conducting a concert tour in only a limited region of the United States, the alternatives from which they can choose for concert promotions services for major concert venues are national.

78.     In the alternative, the relevant geographic markets of concert promotion services for major concert venues are the sub-national regions in which artists require, purchase, and look for promoters to provide promotion services for one or more legs of a concert tour.  Although Plaintiffs have not yet had the discovery needed to finally define these regions, on information and belief, they include at least the following regions:

> Pacific Northwest
> Northern California
> Southern California
> Intermountain West
> Southwest
> Upper Midwest
> Lower Midwest
> Texas
> Ohio Valley
> New England
> Tri-State
> Pennsylvania
> D.C. Metropolitan
> South
> Southeast

### Defendants' Anticompetitive Practices Harm Competition in the Market for Primary Ticketing Services for Major Concert Venues

79.     Ticketmaster's original steps were as follows.  First, it shifted who paid the fees for a primary ticketing service provider's services.  Before Ticketmaster, venues

typically paid such fees.  Since Ticketmaster, fans have paid those fees.  Second, Ticketmaster began paying venues large up-front fees to secure rights to service their primary ticketing, payments that Ticketmaster earned back (in multiples) over the life of its contract.  These twin steps fundamentally altered the market for primary ticketing services, because they created an economic misalignment between the venues and their fans.  Provided as they were with large up-front sums and drastically-reduced costs for ticketing services, venues were far more willing to enter primary ticketing service contracts—particularly long-term exclusive deals—with Ticketmaster, because they made more money and were not punished by their fans as a result.  Indeed, one reason Ticketmaster is today among the most disliked companies in the country is because, on information and belief, it willingly took on the role of the "bad guy" in fans' minds: Ticketmaster, not the venue, made them pay ever-higher ticketing fees.

80.     Because of the sea change it fomented when it first came to prominence in the late 1970s and early 1980s (particularly after it helped introduce electronic ticketing in 1982), Ticketmaster was able to quickly snap up a web of long-term exclusive dealing contracts with venues throughout the country.  Ticketmaster's share of primary ticketing services for major concert venues continued to grow and grow, and it soon became dominant in that market.  It has held that position of dominance ever since, despite multiple attempts by other primary ticketing services to take away market share and power.

81.     One of the problems that Ticketmaster's business practices—*i.e.*, up-front payments, plus kickbacks of a portion of fan-paid ticketing services fees, in exchange for long-term exclusive dealing contracts—is that they reduced competition between venues and incentivized those venues to enter into contracts with Ticketmaster to the detriment of live music fans, *even though* competing venues had already entered contracts with Ticketmaster.  The reason for this is straightforward.  Venues compete with each other to attract artists, because artists pay to rent the venue and bring fans to the venue, where they spend money on tickets, concessions, parking, etc.  Typically,

venues would compete on price in order to make themselves more attractive to artists, such as by, among other things, offering lower ticketing fees for the artist's fans.  By joining the Ticketmaster network of venues, however, the venue puts itself in the same category as its competitors and need not compete on price for ticketing fees, because its largest competitors (other comparable venues in the same region) are also part of Ticketmaster's network.  Thus, Ticketmaster's web of long-term exclusive dealing contracts is largely self-reinforcing; major concert venues are coopted by its dominance and able to make the less consumer-friendly choice because they are sharing in Ticketmaster's monopoly profits (especially since Ticketmaster began allowing venues to help set ticketing fees for their shows).

82.    For this reason, Ticketmaster's claim that a portion of Ticketmaster's contracts come up for bid each year has little to no effect on its continued dominance in the primary ticketing services market, nor the anticompetitive harm consumers suffer from Ticketmaster's exclusive dealing practices.  All up-front bidding (*i.e.*, bidding between primary ticketing services providers) does in that scenario is transfer more of the profits from the eventual ticket sales to the venue; the bidding does not change the nature of the venues' incentives to join the Ticketmaster network, and does not create the serious risk that Ticketmaster will lose any real share of the market.  After all, the only way a competing primary ticketing service provider could take any substantial market share away from Ticketmaster would be to be aware of every single instance in which venues throughout the nation put a contract up for bid, convince those venues to leave the Ticketmaster network, pay huge up-front fees to convince the venues to do so, charge similarly-monopolistic ticketing fees as Ticketmaster without the market power to do so, and then repeat this feat thousands upon thousands of times over the next five years.  As Ticketmaster's over 100% annual renewal rate for exclusive venue deals demonstrates, this is simply not competitively possible.

83.    Beyond the general self-reinforcing nature of Ticketmaster's exclusive dealing practices in primary ticketing services (*i.e.*, the carrot offered by its monopoly

power), any venue contemplating a contract with Ticketmaster must also keep in mind that Ticketmaster is part of the broader Live Nation Entertainment empire (*i.e.*, it wields a very large stick to maintain that monopoly power).  Based on what the public now knows, for the first time, were regular, behind-the-scenes statements from Live Nation Entertainment's highest executives, as well as the merged companies' general business practices, "venues throughout the United States have come to expect that refusing to contract with Ticketmaster will result in the venue receiving fewer Live Nation concerts or none at all."  This fear is real and coercive, and it protects Ticketmaster's primary ticketing services dominance, despite that venues ostensibly put up their contracts for bid, because "[g]iven the paramount importance of live event revenues to a venue's bottom line, this is a loss most venues can ill-afford to risk."  Thus, for those venues that step out of line, Defendants have the ability to threaten and punish—and have actually punished—venues with a loss of future revenues via lost Live Nation Entertainment concerts.

84.     The evidence of this rampant intimidation and anticompetitive coercion only recently came to light.  On August 27, 2019, Senators Richard Blumenthal and Amy Klobuchar sent a letter to the head of the Department of Justice's Antitrust Division regarding significant concerns they had related to the ticketing industry; in particular, with Defendants.  Among other things, Senators Blumenthal and Klobuchar noted that the DOJ's 2010 consent decree for the Live Nation Entertainment-Ticketmaster merger "imposed behavioral conditions to prevent Ticketmaster from using its dominance to stifle new competitors," including "prohibit[ing Defendants] from withholding concerts that Live Nation promotes or concerts by artists that Live Nation manages from venues that use a competitor's ticket platform."  The Senators observed that, at the time of the merger, "many experts were skeptical that the merger conditions were sufficient to create a competitive market," and, importantly for this Complaint, recent evidence indicated that "the skeptics' fears have proven correct."  The letter then went on to report that the Senators were "deeply disturbed by reports

that Ticketmaster has violated the behavioral conditions by retaliating against venues that use a competing ticket platform."

85.     Senators Blumenthal's and Klobuchar's letter echoed an April 2018 investigative piece from the New York Times that the Department of Justice had begun investigating numerous complaints from Ticketmaster's competitors that Live Nation Entertainment "has used its control over concert tours to pressure venues into contracting with its subsidiary, Ticketmaster."   AEG, the second-largest primary ticketing services provider in the United States, "told the [DOJ] officials that venues it manages that serve Atlanta; Las Vegas; Minneapolis; Salt Lake City; Louisville, Ky.; and Oakland, Calif., were told they would lose valuable shows if Ticketmaster was not used as a vendor."   AEG backed up these complaints with emails from the venues, including one in which a booking director asked Live Nation Entertainment to address any issues regarding booking, to which the Live Nation representative replied, "Issue? … Three letters.  Can you guess what they are?"  The following year, Live Nation Entertainment then halved the number of Live Nation-promoted tours that stopped at that venue.  AEG reportedly provided the Department of Justice with numerous other examples.

86.     In late September 2019, the head of the Department of Justice's Antitrust Division confirmed to the Senate Antitrust Subcommittee that the Department was currently "examining allegations of violations" of the consent decree, although he did not elaborate regarding specifics at that time.  Next, on December 13, 2019, the *Wall Street Journal* reported that "[t]he Justice Department is preparing to take legal action against Live Nation Entertainment Inc. on allegations the company has sought to strong-arm concert venues into using its Ticketmaster subsidiary."  As reported, "[t]he department believes the concert-promotion giant's conduct has violated the merger settlement Live Nation and the dominant ticket seller reached with the government in 2010."  Then, on December 19, 2019, the DOJ itself issued a press release stating that "[d]espite the prohibitions in the Final Judgment, Live Nation repeatedly and over the

course of several years engaged in conduct that, in the Department's view, violated the Final Judgment." DOJ accordingly moved for an amendment to the consent decree that extended the decree for five and a half years and clarified several acts that directly violate its terms. As part of the deal resolving this enforcement action, Defendants also agreed to an independent monitor and that any violation warranted an automatic $1,000,000 per violation fine.

87.     In the DOJ's recent motion to amend Defendants' 2010 consent decree, it included several examples of Defendants' wrongful, anticompetitive conduct. These examples include:

(a)     In early 2012, the President of Live Nation Arenas threatened on multiple occasions to divert Live Nation concerts away from a venue if it did not select Ticketmaster as its primary ticketer. After that venue did not select Ticketmaster, two Live Nation executives—the President of Live Nation Arenas and the local Live Nation President in charge of placing concerts in the region – repeatedly threatened that the venue would not get Live Nation shows unless it switched to Ticketmaster. When the venue refused to switch to Ticketmaster despite these threats, Live Nation followed through on its threats and retaliated against the venue by reducing the number of concerts played there. Between 2011 and 2015, Live Nation shows playing at the venue dropped by an average of almost fifty percent.

(b)     In another instance, an arena venue switched from Ticketmaster to a competing ticketing service provider. Immediately after learning that the venue had switched ticketing service provider, Ticketmaster's President contacted the local Live Nation President responsible for placing concerts in the region to suggest that Live Nation book more shows at the venue's nearby rival venue. In the two years following the venue's move to a Ticketmaster competitor for primary ticketing, Live Nation significantly reduced the number of shows promoted at the venue in retaliation.

(c)     In 2017, Live Nation threatened to withhold concerts from a venue if that venue did not contract with Ticketmaster, and then refused to book concerts at

Venue A for a year in retaliation for its selection of a competing ticketer.  In that instance, the venue had issued a request for proposal ("RFP") only for ticketing services and not for live content.  Nevertheless, when Ticketmaster met with the venue's ticketing committee, a Live Nation promoter responsible for deciding where in the region to place Live Nation concerts also attended the meeting.  At the meeting, the Live Nation promoter explicitly threatened to withhold concerts from the venue if it did not select Ticketmaster.  A few weeks later, when the venue informed the Live Nation promoter that it planned to select a competing ticketer that had offered better financial terms, the promoter responded that the competitor's offer would not be better than Ticketmaster's if the venue did not receive as many Live Nation shows.  The Live Nation promoter went on to specify that Live Nation would not book shows at the venue unless it had no other options in the market.  Before the venue's decision not to contract with Ticketmaster, Live Nation estimated that for the next several years it would book three to four shows per year at the venue.  But in the year following the venue's switch to Ticketmaster's competitor, Live Nation promoted zero shows at the venue.  As described to the DOJ, that venue understood that Live Nation's decision to book zero shows at the venue was retaliation for not selecting Ticketmaster as its primary ticketer.

(d)     Also in 2017, another venue evaluated offers for primary ticketing services from Ticketmaster and several competitors.  When the venue informed Live Nation that it was planning to choose Ticketmaster's competitor, Ticketmaster's Vice President for Client Development threatened to withhold all Live Nation concerts from the venue if it did not renew its contract with Ticketmaster.  The Ticketmaster VP told the venue that "if you move in that direction, you won't see any Live Nation shows." Ticketmaster's Executive Vice President and Co-Head of Sports for NBA and NHL Arenas made a similar threat to the venue, telling it that Live Nation's CEO would never put one of his shows on sale through that particular Ticketmaster competitor. Despite Defendants' threats, the venue initially selected a Ticketmaster competitor as

-39-

its primary ticketing provider.  Before that ticketing decision, Live Nation and the venue discussed potential bookings approximately once per week.  But when the venue opted to go with Ticketmaster's competitor, Live Nation stopped contacting the arena about any possible concerts or booking shows at the venue.  For unrelated reasons, one month later, the venue agreed to contract with Ticketmaster.  Immediately thereafter, Live Nation began to get "geared back up" to bring concerts to the venue, because the venue was "back in the family."

(e)     In September 2018, a different venue began evaluating primary ticketing providers in advance of the expiration of its Ticketmaster contract.  When the venue told Ticketmaster that it was considering other primary ticketers, Ticketmaster's executive in charge of Sports for NBA and NHL Arenas told the venue that if it chose another primary ticketer, its Live Nation concert volume would be put at risk because Live Nation concerts would either skip the market altogether or play at another venue.  Later, that senior executive reiterated his threat that if the venue went with another primary ticketing provider, Live Nation would pull concerts from the venue and reduce the volume of shows held there.  Despite receiving a competitive bid from a Ticketmaster competitor, the venue determined that the risk of contracting with a ticketing service provider other than Ticketmaster was too great.  The venue renewed its contract with Ticketmaster for primary ticketing services.

(f)     In yet another instance, Defendants threatened to blacklist a certain venue from all future Live Nation shows after the venue decided to contract with Ticketmaster's competitor for primary ticketing services.  According to the venue's executive, Ticketmaster's President warned the executive that if the venue went with a competing ticketing service provider, Ticketmaster's response "would be 'nuclear'" and "though he would deny it if I repeated it, Live Nation would never do a show in our building, that they would find other places for their content . . . ."  Following a conversation with Ticketmaster's President, a second executive from the venue reported that Ticketmaster and Live Nation "will not do any business whatsoever with our

stadium" and that Ticketmaster was "drawing a line in the sand and picking this as their 'hill to die on.'" The venue executive went on to state his understanding that the venue was "now on 'the black list.'"

88.  On information and belief, the above examples are not isolated instances and instead reflect a widespread practice directed, encouraged, and mandated from and also actively participated in and conducted by Live Nation Entertainment's highest executives on down. For this conclusion, one need not simply rely on the facts as reported by the DOJ. Instead, one can look to the company's own admissions. As previously noted, Mr. Rapino, Live Nation Entertainment's CEO and President, publicly stated in September 2019—on information and belief, for the first time publicly—that Live Nation Entertainment's concert promotion segment considers whether a venue selected Ticketmaster as its primary ticketing service provider. If the venue did not, Mr. Rapino stated, then it "won't be the best economic place anymore" for Live Nation-promoted tours "because we don't hold the revenue." In these public comments, Mr. Rapino claimed that this was not a "threat" to venues; however, his description of how Defendants regularly practice their business was clearly one that, as the DOJ's recent report makes clear, anyone in the live music industry was able to understand. Implicit threats are still threats, and Live Nation Entertainment did not confine itself to implicit threats; it made explicit threats and backed up those threats with reduced Live Nation concerts at disobedient venues.

89.  Regardless of any effects the DOJ's recent enforcement action and extension to the consent decree *may* have on future competition in ticketing (which unfortunately remains to be seen), the damage has already been done and Defendants have, through their anticompetitive conduct, extended and maintained Ticketmaster's monopoly power for years. That conduct damaged Plaintiffs and the putative classes through, *inter alia*, supracompetitive fees Ticketmaster has been able to charge on all ticket purchases through its platforms since the two companies merged.

-41-

**Defendants Are Now Attempting to Monopolize (and Succeeding in Monopolizing) Secondary Ticketing Services for Major Concert Venues**

90.     The rise of the internet ultimately helped create, for the first time, a truly viable and robust secondary market for concert tickets in the U.S.  This is because the internet's ability to connect individuals from all walks of life allowed secondary ticketing service providers to create platforms where secondary ticket sellers and purchasers could more easily congregate and consummate secondary ticket sales. Whereas, pre-internet, a secondary ticket purchaser needed to affirmatively seek out ticket brokers or find scalpers near the entrance of a show, now they could locate secondary tickets with just the click of a button.  Similarly, ticket resellers suddenly had a far broader reach via an easy-to-access electronic platform that dramatically lowered the transaction costs for ticket resales.  These mutual conveniences allowed the market to flourish, which created substantial benefits for ticket resellers and purchasers.

91.     The proliferation of the secondary market for concert tickets, however, was not without negative effects.  Because a ticket reseller may charge more for secondary tickets than their face value, opportunistic individuals and companies built business models around buying up large amounts of primary tickets at the beginning of a general sale and then selling those tickets at a markup on the secondary market.  They could do so because they and other similar opportunists locked up the supply of the tickets for a show, thereby driving up prices for fans that wanted to attend the concert. These resellers (often, ticket brokers, but also just as often run-of-the-mill scalpers) developed a number of different techniques to quickly purchase primary tickets, including operating multiple accounts simultaneously, employing small armies of ticket purchasers at the beginning of general sales, and by using "bots," programs that automatically purchase tickets far faster than a human could.

92.     Many states have enacted laws ensuring that ticket purchasers may resell their tickets, and secondary ticket sale platforms exist today because there is substantial demand for secondary ticketing services.  Until Defendants' actions described herein,

there was robust competition between secondary ticketing services providers, which benefited consumers to the extent they needed or wanted to purchase secondary tickets.

93.     As the dominant primary ticketing service provider for major concert venues in the U.S., Ticketmaster hugely benefited from the growth of secondary concert ticket sales.  The largest concerts in the U.S., which are typically held at major concert venues, are also typically the most popular.  Given that demand is extremely high for these shows, ticket brokers and scalpers are incentivized to quickly purchase as many primary tickets as they can; the rest are then purchased by real fans.  All of this frenzied purchasing during the general sale benefits the primary ticketing service provider (typically, Ticketmaster) because, as discussed above, it generates revenues by levying fees on primary ticket sales.  A robust secondary ticket market is thus a benefit to primary ticketing service providers, because it maximizes primary ticket sales.

94.     Over the years, Ticketmaster has tread a narrow line by publicly decrying ticket broker practices while privately encouraging them.  Defendants began a concerted effort to grow their secondary ticketing services in addition to their dominant primary ticketing service, so that Ticketmaster could make money off the initial purchase *and* resales of the very same concert tickets.  This was a mandate from Mr. Rapino on down.

95.     Ticketmaster first entered the secondary ticketing services market by acquiring preexisting secondary ticketing service providers.  It then kept the platforms separate from its primary ticket site for several years.  More recently, however, Defendants integrated those secondary ticketing service providers into Ticketmaster's broader online platform, such that consumers can now purchase primary *or* secondary tickets off of Ticketmaster.com or the Ticketmaster mobile app, and may not even know if they are purchasing a primary or secondary ticket at the time of sale.

96.     Given the PR problems from publicly embracing ticket brokers and other entities whose business is purchasing and reselling tickets at a markup, Defendants have claimed over the years that they are taking efforts to stifle broker behavior.  One

of the primary ways Defendants do so is through the "conditional license" Ticketmaster grants to users of its website and/or mobile app. The conditional license allows users to view Ticketmaster's site and access its contents only if they agree to a bevy of restrictions that prevent brokers from purchasing tickets from Ticketmaster and then reselling them on rival secondary ticketing platforms. As one example, the conditional license prevents users from refreshing Ticketmaster's ticketing pages "more than once during any three second interval." The conditional license also restricts the use of "ticket bot technology," which makes it more difficult for brokers to engage in bulk purchases of tickets. The conditional license contains many similar terms as well, and Ticketmaster claims elsewhere that it will put brokers to the back of the electronic line if it spots them in the queue.

97.   Defendants claim this conditional license is pro-consumer, but the truth is that it is simply one more tool Defendants use to effectuate their broader anticompetitive scheme. As publicly reported earlier in 2019, Ticketmaster, with Live Nation Entertainment's direction and support, regularly sets aside primary tickets for ticket brokers, so those brokers can purchase and then resell those tickets. Defendants accomplish this goal through "ticket banks" that are ostensibly for presale tickets and ticket "holds" (*i.e.*, allotments of the total tickets "held" aside from the general sale for industry insiders, such as artists, agents, venues, promoters, marketing departments, record labels, and sponsors). The ticket banks have neutral names so as not to trigger fan suspicion, but the ticket banks (and the tickets placed into them) are really for the brokers. In this way, Ticketmaster is able to bolster its relationship with ticket brokers and maximize primary ticket sales while also growing its secondary ticketing service business. As a recent investigation by the New York Attorney General revealed, tickets set aside for holds and presales can often exceed 50% of the total tickets for a concert

98.   Ticketmaster's conditional license plays into this scheme by acting as the sword Ticketmaster wields against ticket brokers if they do not agree to its anticompetitive demands. Put simply, Ticketmaster will allocate primary tickets for a

broker to a ticket bank *if* that broker agrees it will resell its tickets through Ticketmaster's secondary ticket platform.   If the broker does not agree, then Ticketmaster will use the conditional license to try to keep the broker off its platform. It is able to do so with impunity because of the power Ticketmaster holds over the supply of primary tickets at major concert venues, and because Live Nation Entertainment, as the dominant concert promoter in the nation, controls the vast bulk of major concert tours.   Faced with this potent combination, ticket brokers seeking to resell major concert venue seats have no other choice but to use Ticketmaster's secondary ticketing services, even though Ticketmaster is not as attractive a platform for secondary sellers as Ticketmaster's competitors.   On information and belief, examples of brokers that have agreed to this setup include DTI, Dynasty, and Eventellect.

99.   Another tactic Ticketmaster employs to dominate secondary ticketing services for major concert venues is to limit primary purchasers' ability to transfer their tickets through any means other than Ticketmaster's secondary ticketing platform. Defendants do so most prominently through a combination of mobile ticket and Ticketmaster's branded "SafeTix" technology, although Defendants regularly attempt to limit ticket transferability through other means as well.   The overall goal of these efforts is to prevent primary ticket purchasers from using competing secondary ticketing service platforms, to competitors' detriment and Defendants' benefit.   This part of Defendants' scheme relies on utilizing their dominance over primary ticketing services, their control over most major concert tours in the U.S., and their ability to employ technological trickery for anticompetitive purposes.

100.   Due to the rise of smartphone usage, many primary ticketing service providers (including, of course, Defendants) have developed electronic ticket

1  technology.[6]  Primary purchasers receive an email with a link to their mobile ticket, or

2  receive the ticket directly on a smartphone application the primary ticketing service

3  provider creates and provides.  That mobile ticket usually includes a QR or other type

4  of electronic code that attendants at an event scan to permit the purchaser to enter.

5      101.  Historically, primary ticket purchasers have been able to transfer electronic

6  tickets easily.  Either as the result of a resale or simply in order to provide the ticket to a

7  friend or family member, primary purchasers could send their ticket electronically and

8  without cost.  As relevant to secondary ticketing services, a ticket reseller could either

9  upload their electronic ticket to the secondary ticketing platform of their choice, or send

10  it directly to a secondary purchaser after the completion of the resale.  Which option

11  they utilized depended on the secondary ticketing platform's procedures or, in some

12  instances, the ticket reseller's personal preference.

13      102.  Recently, however, Defendants have taken steps to prevent primary ticket

14  purchasers for events at major concert venues (the vast majority of which, due to

15  Defendants' dominance of primary ticketing services for major concert venues,

16  purchase tickets through Ticketmaster) from transferring their tickets, except through

17  Ticketmaster's secondary ticketing platform.  Defendants do so by utilizing

18  technological limits built into their primary ticketing platform that they and artists using

19  their concert promotion services can place on primary tickets sold at major concert

20  venues.  Ticketmaster has applied various names to these technological limits over the

21  years, including mobile tickets, Verified Fan tickets, and, more recently, SafeTix.

22  SafeTix, in particular, demonstrates the insidious competition problems Defendants'

23  transfer restrictions create (particularly in combination with its other technologies).

24      103.  Defendants ostensibly advertise SafeTix as "encrypted mobile tickets built

25  with leading-edge technology" that "come standard with powerful fraud and counterfeit

---

26

27      [6]  In fact, many different industries now utilize electronic tickets.  One particularly
notable example is the airline industry, which now offers passengers mobile tickets they

28  can present on their smartphones.

protection." They "are powered by a new and unique barcode that automatically refreshes every few seconds so it cannot be stolen or copied, keeping your tickets safe and secure." The tickets are only available on Ticketmaster's smartphone application. A SafeTix ticket holder supposedly can transfer some or all of their tickets to someone else "[i]n just a few taps" of their smartphone. The technology also "ma[kes] it a snap to sell your tickets on the world's largest marketplace [*i.e.*, Ticketmaster's secondary ticketing platform] in a few taps."

104.    Similar to the conditional license, however, Defendants use SafeTix (and its functional predecessors) for anticompetitive, rather than procompetitive, purposes. Primary ticket purchasers typically purchaser their tickets with the understanding that they can resell their tickets wherever and however they want. Using typical practices, they can transfer their tickets electronically after selling through a different secondary ticketing platform. But SafeTix primary purchasers often find only after the fact that they cannot transfer their tickets in this manner. As Defendants themselves admit, the only way to know if one can transfer their tickets is if they "look for the 'Transfer Tickets' button on your order [i.e., after the purchase]. If transfer is not available, the button will not be there." As public reports demonstrate, in some instances, primary purchasers had no advance notice of this limitation on their transferability.[7] In other instances, primary purchasers did receive advance notice of non-transferability, but they were conveniently only allowed to resell their tickets through Ticketmaster's secondary ticketing platform.[8]

105.    Competing secondary ticketing service providers, as well as a competitive secondary ticketing marketplace, require a free-flowing supply of primary tickets.

---

[7]    *See*, *e.g.*, Sarah Pittman, *The Black Keys' Wiltern Snafu Thrusts SafeTix Into Spotlight*, Pollstar (Sept. 26, 2019), https://www.pollstar.com/News/the-black-keys-wiltern-snafu-thrusts-safetix-into-spotlight-141163.

[8]    *See*, *e.g.*, *Pearl Jam Deploys TicketMaster's SafeTix Tech*, Ticketing Business News (Jan. 17, 2020), https://community.pearljam.com/discussion/283246/pearl-jam-deploys-ticketmaster-s-safetix-tech.

Without a supply of primary tickets to list on their platforms, such secondary ticketing service providers simply cannot compete.  Furthermore, competing secondary ticketing service providers have no ability to circumvent the technological limits Defendants have increasingly placed on primary ticket transferability.

106.   Defendants' use of the conditional license to force secondary resellers to use Ticketmaster's platform, as well as their limitations on primary ticket transferability, have had anticompetitive effects for both primary and secondary ticketing services.  Among other effects, one effect is to grow Ticketmaster's secondary ticketing service business at the expense of its rivals (which provide the competing secondary ticket platforms on which brokers can opt to sell their purchased tickets).  Another effect is to dramatically increase Ticketmaster's revenues by allowing it to levy fees on the second (and third, etc.) sale of the same ticket(s) it sold in the primary sale.  Ticketmaster has steadily grown its secondary ticketing service business for years and today processes well over a billion dollars annually of secondary concert ticket sales at major concert venues.  This growth has come at the expense of Ticketmaster's secondary ticketing service provider competitors, who have no ability to compete with Ticketmaster on the merits (although they struggle to do so).  It also has come at the expense of consumers because, despite the fact that Ticketmaster's secondary ticketing service competitors for major concert venues charge consumers lower fees, Defendants have steadily grown Ticketmaster's secondary ticketing market share through the practices described herein, leading to ever more supracompetitive secondary ticketing fees for both primary and secondary ticketing services at major concert venues.  That is a third effect of Defendants' conduct.  This is discussed in further detail in the following Section, pages 48-55.

**Defendants' Acts Have Had Far-Reaching Anticompetitive Effects That Damaged Plaintiffs in Direct and Quantifiable Ways**

107.   As a result of Defendants' anticompetitive conduct, Plaintiffs have paid anticompetitively-high fees on primary ticket purchases for years.  Ticketmaster has

reduced competition for such services through the anticompetitive conduct described above and therefore largely immunized itself from price competition on its ticketing fees.  Thus, consumers who would otherwise be able to obtain primary tickets at lower overall cost must pay supracompetitive prices to obtain tickets from Ticketmaster, or else not be able to obtain tickets at all in the primary market.

108.   For example, some major concert venues are also sport venues.  There are instances where Ticketmaster is the exclusive primary ticketing service provider for the live music events at a major concert venue, but is not the exclusive primary ticketing service provider for the sports events at the venue.  As of late 2017, one such venue was the American Airlines Arena, in Miami.  The following chart compares the ticketing fees for the live music events for which Ticketmaster was the exclusive primary ticketing service provider against the sports events for which it was not.  As is clear, the fees on live music events were markedly higher:



Source: Ticketmaster, "Licensed User Agreement," Oct. 28, 2014, 8–10 (TM00000362 at -369–371, -373).

109.   A similar pattern emerges at Philips Arena, Atlanta, which has a similar separation between Ticketmaster's exclusivity over primary ticketing for live music events, and its lack of exclusivity over sporting events:

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11



Source: Ticketmaster, "Licensed User Agreement," Jul. 11, 2011, 50 (TM00000243 at -289–291).

12
13
14

These examples are indicative of the broader harm Plaintiffs (live music fans) suffered at Defendants' hand—systematic, anticompetitively-high ticketing fees that began long before the class period.

15
16
17
18
19
20
21
22
23
24
25
26

110.   But one need not only look to the United States for proof that Ticketmaster's exclusive dealing in primary ticketing services for major concert venues has anticompetitively raised fees for primary ticket purchasers.  The United Kingdom is an example of a geographic market in which no one provider has extensive exclusive deals for primary ticketing services.  In that country, it is very rare for a single provider to conduct all primary ticketing services at a venue; instead, the venue typically selects a provider for a portion of primary ticketing sales, and then others involved with the show (*e.g.*, the promoter, artist, etc.) each may select their own primary ticketing service provider(s) for a portion of the tickets.  Ticketing service providers therefore compete with each other, including by offering lower fees for fans.  As the data show, ticketing fees in the U.S. (under Ticketmaster's exclusive dealing dominance) are invariably higher than the fees for tickets with the same face value in the U.K.):

27
28

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11



Note: Fees calculated on the basis of a purchase of two tickets at the given face value. Y-axis represents (service fee) / (total combined face value). Ticket face value is given in USD. UK ticket prices converted to USD at the exchange rate available at the time of data collection.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26



Note: Fees calculated on the basis of a purchase of two tickets at the given face value. Y-axis represents (total fees) / (total combined face value). Ticket face value is given in USD. UK ticket prices converted to USD at the exchange rate available at the time of data collection.

27

28

111.   As noted herein, however, Defendants' scheme does not just harm competition in primary ticketing services for major concert venues; they have also

harmed (and continue to attempt to harm) competition in the secondary ticketing services market. For those consumers in the Secondary Ticketing Services Consumer Class (defined below), they are harmed by having to pay inflated secondary ticketing fees when purchasing from Ticketmaster rather than competitors. The fees Ticketmaster charges secondary ticket purchasers are, on average, significantly higher than its competitors' secondary ticketing fees. This fact is important because, all else being equal, secondary ticket resellers would ordinarily be incentivized to resell tickets wherever consumers would incur the lowest fees, because that increases demand for ticket resales given that the platform in question is less expensive for purchasers. In other words, if seller fees are either the same or roughly equivalent, then secondary ticket platforms that are cheaper for purchasers are better for the resellers.

112. These economic incentives are important because Ticketmaster's secondary ticket reseller fees are either the same or *higher* than competitors' fees, making the secondary ticket transaction either neutral or *worse* for resellers if they use Ticketmaster's platforms as opposed to its competitors' platforms. Given this fact, the focus then moves to purchasers. Ticketmaster's competitors all charge *lower* fees to secondary ticket purchasers than Ticketmaster. The following chart shows this fact; Ticketmaster's largest secondary ticketing service competitors all charge purchasers lower fees on each transaction:

| Secondary Ticketer | Buyer Fees[9] |
|---|---|
| TicketsNow | 15% |
| TicketExchange | 15% |
| StubHub | 10% |
| Vivid Seats | 10% |
| TickPick | 0% |

Source: Orbis Research Analysis, 2019

Given these comparative fees, a rational ticket reseller, unencumbered by Defendants' anticompetitive scheme, would choose Ticketmaster's competitors, *not* Ticketmaster, if they want to maximize the profits they make from ticket resales. This is because (a) there is no clear benefit in terms of lower fees from choosing Ticketmaster rather than its competitors, and (b) there will be more demand for resale tickets on competitors' platforms, because the tickets sold there are less expensive for consumers. Thus, in a competitive market, one would expect to see Ticketmaster either enjoy no (or very little) secondary ticketing service growth, or that it would lower its fees in order to compete with lower-priced competitors.

113. But that is not what happened. Instead, the evidence shows that Ticketmaster's secondary ticketing services growth exploded since it made that business a priority in the past few years. Ticketmaster did not lower fees in order to achieve this growth, and it did not come at the expense of Ticketmaster's dominant primary ticketing services. Instead, Ticketmaster grew its share (and, on information and belief, dominance) in secondary ticketing services for major concert venues by engaging in the anticompetitive practices alleged herein. Defendants thus steadily gained market share (and continue to do so today) in secondary ticketing services via anticompetitive conduct while maintaining supracompetitive prices charged to secondary ticket purchasers. That is the epitome of anticompetitive effects.

---

[9]   The fees listed in this chart reflect a percentage of the ticket price for the final sale (*e.g.*, TicketsNow charges ticket buyers fees equal to 15% of the ticket price). Ticketmaster's fees are higher than all fees depicted in the chart, and as noted previously, can exceed 30% of the total transaction, when seller fees are also included.

114.   Defendants' efforts to obtain market power in the secondary ticketing services for major concert venues market by surreptitiously feeding primary tickets to ticket brokers and limiting primary ticket transferability have also had the effect of anticompetitively raising prices for its primary ticketing service fees.  This is because, *inter alia*, fees levied on primary ticket sales are typically set as a percentage of, or set fee based on, the face value of the primary ticket.  By creating an artificial picture of demand for primary ticket sales through the anticompetitive conduct alleged herein, Defendants drive face values of tickets up overall, which leads to anticompetitively-higher ticketing fees.  Similarly, in situations where an artist uses Ticketmaster's dynamic ticket pricing services, Defendants' conduct artificially pushes up dynamic ticket prices and leads to both higher face values *and* higher fees on primary ticket purchases.  Defendants' power (and, on information and belief, dominance) over both primary and secondary ticketing services for major concert venues also permits them to maximize fees from the former while also growing fees from the latter.

115.   Again, a comparison to a geographic region in which Ticketmaster does not have dominance via exclusive deals demonstrates how its business practices anticompetitively push up ticketing fees.  In addition to the empirical evidence discussed above with respect to lower primary ticketing services fees in the United Kingdom, similar evidence from the same region shows that freer competition in secondary ticketing services has a similar downward effect on price.  The GAO, in its recent analysis of secondary ticketing fees in the United States, noted that, while service fees for U.S. venues the GAO analyzed averaged 22% and could go as high as 38%, "[i]n the United Kingdom, where the venue and promoter typically contract with multiple ticket sellers, ticket fees are lower than in the United States—around 10 percent to 15 percent of the ticket's face value, according to a recent study."[10]

---

[10]   The referenced study is Michael Waterson, *Independent Review of Consumer Protection Measures Concerning Online Secondary Ticketing Facilities*, a report

116. The result of Defendants' efforts, working in concert with venues and ticket brokers, is the substantial lessening of competition in the relevant markets for primary and secondary ticketing services for major concert venues, injuring both competitors and consumers alike.

### ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

117. Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the anticompetitive acts alleged herein prior to their disclosure in 2018, 2019, and 2020.

118. Since the start of the class periods, Defendants have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiffs and class members. These violations each constituted injurious acts.

119. In addition, Defendants' violations of the antitrust laws were kept secret from Plaintiffs and putative Class members. As a result, Plaintiffs and class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for ticketing fees in the United States throughout the class periods. Defendants affirmatively and fraudulently concealed their unlawful conduct by, *inter alia*:

(a) Agreeing to the consent decree, which forbade them from tying or conditioning primary ticketing contracts to access to Live Nation-promoted concerts, and making a public commitment to abide by its terms as a condition of the Live Nation Entertainment-Ticketmaster merger;

(b) Maintaining in public, ever since the merger, that they were abiding by the consent decree's terms and competing on the merits, rather than by threatening the loss of Live Nation-promoted concerts in order to obtain ticketing contracts. Examples of such public statements include:

---

prepared at the request of the United Kingdom Department for Business, Innovation and Skills and Department for Culture, Media and Sport (London: May 2016), 30-31.

1          • Stating in its SEC Form 10-Ks from 2015-19 that, "Competition in the live

2   entertainment industry is intense.  We believe that we compete primarily on the basis of

3   our ability to deliver quality music events, sell tickets and provide enhanced fan and

4   artist experiences."

5          • Stating at multiple points in 2016 and 2017 in a recent antitrust litigation

6   against Defendants in this District Court, *Complete Entertainment Resources, LLC v.*

7   *Live Nation Entertainment, Inc.*, that Defendants had never tied or conditioned ticketing

8   contracts on access to Live Nation-promoted concerts, going so far as to convince the

9   Court to provide only limited discovery on that issue in the case.  Later in the case,

10  Defendants' representatives made multiple statements that there was no evidence of

11  such tying or conditioning, and attempted to excoriate the plaintiff for including such

12  allegations in the first place.  Such conduct echoed affirmative statements from

13  Defendants' employees, officers, and directors that they competed solely on the merits

14  in obtaining ticketing contracts.

15         • Implementing the "Verified Fan" program in 2017, which Ticketmaster

16  claimed—often through interviews from David Marcus, Ticketmaster's EVP of

17  Music—helped cut down scalping behavior by "90%" by putting tickets in the hands of

18  "real fans" rather than secondary ticket resellers.

19         • In September 2019, Mr. Rapino tried to downplay the ongoing DOJ

20  inquiries and suggest that Defendants' business practices were in keeping with the

21  consent decree's requirements.  He stated, "We educate all of our employees: 'This is

22  how you go to market [with] Ticketmaster versus Live Nation, this and this is what you

23  can't say.  Win the business straight:  You can bundle the business, you can add value,

24  you can present together — it's great to have Ticketmaster ticketing your building and

25  have Live Nation as your content partner.  That's how we generally win a business:

26  because of the strong value proposition we provide."

27         (c)     By implementing and imposing the conditional license, which

28  ostensibly limited ticketing brokers' and/or other mass secondary ticket resellers'

access to Defendants' ticketing platforms, which indicated that Defendants were taking lawful steps to prevent ticketing brokers from accessing their ticketing platforms instead of primary ticket purchasers;

(d)     By publicly stating that they were taking steps to curtail abuses of primary ticket purchases by ticket resellers.  Examples of such statements include the following:

- In a 2012 blog post, Ticketmaster stated that "the impact BOTS have on you, our fans, isn't fair.  We want them gone."  It went on, "We invest millions of dollars in our technology to differentiate the real fans from the BOTS" and "Ticketmaster actively works with lawmakers, law enforcement and with our clients to combat BOTS – and we have done this for years."  It then—ironically—"challenge[d] all in the industry to follow our lead and step up and take action against those who use and profit from BOTS."

- In connection with a 2016 article for ampthemag, Mr. Rapino admitted that "he remains focused on finding ways to curb secondary market ticket sales and put the money back into the pockets of artists and promoters."  He further was quoted as stating that "his business model isn't selling a ticket multiple times, it's selling the right ticket to the right fan at the right price and that sale happens once, not multiple times," and he was quoted as saying, "We don't benefit on the $700 Beyonce ticket."  "The scalper or the mom and pop seller get the uplift.  Our great motive is that $8 billion is in the gross, and that we are splitting it with the artist, and we make our piece, and the artist makes the $700.  Our number one motive is to get the 8 billion in the gross for the content, not to be on the sidelines making a service fee on a secondary ticket."

- In connection with a 2017 article for *Vulture*, David Marcus, Ticketmaster's EVP of Music, stated regarding secondary ticketing, "It feels like an injustice.  It's the sense of, 'I don't know who's screwing me, but I feel screwed.'"  He went on, "How do we make sure that the primary industry recaptures that value?  Because that's where the art is being created, that's where the risk is being taken, that's

where the fans are.   The extent that there's $8 billion in activity in a secondary marketplace?  Shame on us.  That's the primary industry's weakness and inefficiency and failure to do what we can do for artists and fans."

- Mr. Marcus also provided an interview to *The Verge* in 2018, in which he conveyed that "Scalpers and their bots are public enemy number one, to hear Marcus tell it, and he talks about battling them as a 'constant arms race,' one that Ticketmaster hopes to end by addressing 'the root causes' of the predatory resale market: 'Anonymous people buying tickets on a first-come-first-serve basis, at below market value.'" "Scalpers completely abuse artists and fans, not to accomplish anything but a profit," Marcus says.  "If you want to build a successful retail brand, you can't stand by and watch that happen.  You have to change the way you do business."

120.   Plaintiffs and the class members did not discover, nor could have discovered through reasonable diligence, that Defendants were violating the antitrust laws until less than four years before this litigation was initially commenced, because Defendants used deceptive methods to avoid detection and to affirmatively conceal their violations from the ticket-buying public.

121.   Defendants did not tell Plaintiffs or other class members that they were violating the consent decree, coercing disobedient venues into selecting Ticketmaster as their primary ticketing service provider, misusing the conditional copyright license for Ticketmaster, or engaging in the other unlawful collusive practices alleged herein.  By its very nature, Defendants' anticompetitive conduct, because it was performed outside the sight and knowledge of the ticket-buying public, was inherently self-concealing.

122.   As detailed above, Defendants engaged in a successful anticompetitive scheme that they affirmatively concealed:

(a)   By meeting with venues, ticket brokers, and other parties that enabled the scheme out of sight from the ticket-buying public (including through the use of private telephonic and electronic communications);

(b)     By demanding and otherwise ensuring that the threats, back room deals, and other anticompetitive practices were not discussed publicly, or did not otherwise reveal the nature and substance of the acts and communications in furtherance of their alleged scheme; and

(c)     By publicly claiming (until only recently) that they were abiding by the consent decree's terms, were using their conditional license in a lawful way, and otherwise were competing on the merits rather than squashing competition through anticompetitive means.

123.   As a result, Plaintiffs did not discover Defendants' conspiracy, even with the exercise of reasonable diligence.  Plaintiffs' diligence included reviewing the terms of purchases on Ticketmaster.  Plaintiffs' review of these and other public materials was insufficient to put Plaintiffs on notice of Defendants' anticompetitive scheme.

## CLASS ACTION ALLEGATIONS

124.   Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of two sub-classes, defined as follows:

The **"Primary Ticketing Services Consumer Class"**:

All end-user purchasers in the United States who purchased a primary ticket and paid associated fees for primary ticketing services for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation Entertainment, Inc. at any point since 2010.

The **"Secondary Ticketing Services Consumer Class"**:

All end-user purchasers in the United States who purchased a secondary ticket and paid associated fees for secondary ticketing services for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation Entertainment, Inc. at any point since 2010.

125.   Excluded from the classes are ticket brokers, Defendants; the officers, directors or employees of Defendants; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of Defendants. Also excluded from the classes are any professional ticket resellers.  Also excluded from the classes are any federal, state or local governmental entities, any judicial officer

presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

126.   Plaintiffs do not know the exact number of class members at the present time.  However, due to the nature of the trade and commerce involved, there appear to be hundreds of thousands if not millions of class members such that joinder of all class members is impracticable.

127.   The classes are defined by objective criteria, and notice can be provided through techniques similar to those customarily used in other antitrust cases and class actions, including use of Defendants' records.

128.   There are questions of law and fact common to each of the classes, including whether Defendants violated the antitrust laws through the actions alleged herein.

129.   Plaintiffs assert claims that are typical of the classes.  Plaintiffs and all class members in each class have been subjected to the same wrongful conduct because they all have purchased primary and/or secondary tickets and paid higher associated fees for primary and/or secondary ticketing services for events at major concert venues from Ticketmaster than they otherwise would have paid.

130.   Plaintiffs will fairly and adequately represent and protect the interests of the classes.  Plaintiffs are represented by counsel competent and experienced in both antitrust and class action litigation.

131.   Class certification is appropriate because Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

132.   Class certification is also appropriate because common questions of law and fact predominate over any questions that may affect only individual members of the classes, including, *inter alia*, the following:

(a)   whether Defendants in fact engaged in anticompetitive acts aimed at unreasonably restraining competition for primary and secondary ticketing services;

(b)   whether such conduct violates the Sherman Act;

(c)   whether such conduct injured the class members; and

(d)   whether monetary damages and injunctive relief should be provided to class members as a result of Defendants' wrongful conduct.

133.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual class members is impracticable.  Furthermore, because the monetary injury suffered by each individual class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual class members to redress the wrongs done to each of them individually and the burden imposed on the judicial system would be enormous.

134.   The prosecution of separate actions by the individual class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants.  In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.

## INTERSTATE TRADE AND COMMERCE

135.   Defendants' conduct has taken place in and affected the continuous flow of interstate trade and commerce of the United States, in that, *inter alia*:

(a)   Defendants have provided primary and secondary ticketing services for major concert venues throughout the United States;

(b)   Defendants have used instrumentalities of interstate commerce to provide primary and secondary ticketing services for major concert venues throughout the United States;

COMPLAINT

(c)     In furtherance of the anticompetitive scheme alleged herein, Defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

(d)     The anticompetitive scheme alleged herein has affected billions of dollars of commerce. Defendants have inflicted antitrust injury by artificially raising prices paid by Plaintiffs and the class members.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2)**

**(against All Defendants)**

136.   Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

137.   Defendants have willfully acquired and maintained monopoly power for Ticketmaster in the relevant markets for primary ticketing services for major concert venues and, on information and belief, for secondary ticketing services for major concert venues.

138.   Ticketmaster possesses monopoly power in the relevant market for primary ticketing services for major concert venues and, on information and belief, the relevant market for secondary ticketing services for major concert venues. Ticketmaster has the power to control prices or exclude competition in the relevant markets.

139.   Ticketmaster has market share of at least 70% of the relevant market for primary ticketing services for major concert venues and, on information and belief, at least 60% of the relevant market for secondary ticketing services for major concert venues.

140.   Defendants have willfully acquired and maintained monopoly power for Ticketmaster in the relevant markets, by means of predatory, exclusionary, and anticompetitive conduct, including but not limited to long-term exclusive dealing

arrangements, leveraging, coercion of disloyal customers, ticket brokers, and others, tying arrangements, and vertically-arranged boycotts, as alleged herein.

### Exclusive dealing arrangements

141.   Defendants have entered into long-term exclusive dealing arrangements with venues with respect to the provision of primary and secondary ticketing services.

142.   Defendants' arrangements have had the effect of foreclosing competition in a substantial share of the line of commerce affected and the relevant market for primary and secondary ticketing services for major concert venues.

143.   Defendants' arrangements cannot be circumvented.

144.   Defendants' arrangements with major concert venues are of long duration and not easily terminable as a matter of practical economics.

145.   Defendants have coerced major concert venues to enter into these arrangements.

146.   Defendants' arrangements are not the product of competition.

147.   Defendants' arrangements have had the effect of substantially lessening competition and tending to create a monopoly in the relevant market for primary and secondary ticketing services for major concert venues.  Defendants have used that monopoly power in a predatory, exclusionary, and anticompetitive manner to monopolize, on information and belief, the relevant market for secondary ticketing services for major concert venues.

### Leveraging

148.   Defendants have monopoly power in the relevant market for primary ticketing services for major concert venues and in the relevant market for concert promotion services for major concert venues.

149.   Defendants have used their monopoly power in those relevant markets in a predatory, exclusionary, and anticompetitive manner to monopolize the relevant market for primary ticketing services for major concert venues and, on information and belief, the relevant market for secondary ticketing services for major concert venues, and

exclude competitors from those markets, including but not limited to by means of coercion of disloyal customers, ticket brokers, and others, tying arrangements, long-term exclusive dealing arrangements, and vertically-arranged boycotts.

150.   Defendants have used their monopoly power to monopolize the relevant markets for primary ticketing services for major concert venues and secondary ticketing services for major concert venues.

<u>Coercion of and threats against disloyal customers, ticket brokers, and others</u>

151.   Defendants have also coerced major concert venue operators to enter into long-term exclusive deals with Ticketmaster.

152.   Defendants have coerced major concert venue operators not to work with other primary and secondary ticketing service providers.

153.   Defendants' threats and coercion have impeded competitors' ability to secure contracts for primary and secondary ticketing services with the majority of major concert venues in the United States.

154.   By way of, *inter alia*, the misuse of Ticketmaster's conditional license, Defendants have agreed with and/or coerced ticket brokers and other ticket resellers not to work with other secondary ticketing service providers.

155.   By way of¸ *inter alia*, building in and applying technological limitations on primary ticket transferability, Defendants have agreed with and/or coerced artists into preventing primary ticket purchasers from working with other secondary ticketing service providers.

156.   Defendants' threats and coercion have impeded competitors' ability to attract resellers to their secondary ticket platform for secondary ticket sales.

<u>Tying arrangements – concert promotion and primary ticketing services</u>

157.   The provision of concert promotion services and primary ticketing services are two separate services or products.

158.   Defendants have conditioned the provision of concert promotion services on the use of primary ticketing services from Ticketmaster.

159.   Defendants have sufficient economic power in the relevant market for concert promotion services to enable them to restrain trade in the relevant market for primary ticketing services.

160.   Defendants' conduct has affected a not insubstantial amount of interstate commerce in the provision of primary ticketing services for major concert venues.

161.   Defendants' conduct has had an anticompetitive effect in the relevant market for primary ticketing services for major concert venues.

Tying arrangements – primary and secondary ticketing services

162.   The provision of primary ticketing services for major concert venues and secondary ticketing services for major concert venues are two separate services or products.

163.   By way of, *inter alia*, exclusive dealing contracts, the misuse of Ticketmaster's conditional license, and technological limitations on primary ticket transferability, Defendants have conditioned the provision of primary ticketing services on the use of secondary ticketing services from Ticketmaster.

164.   Defendants have sufficient economic power in the relevant market for primary ticketing services for major concert venues to enable them to restrain trade in the relevant market for secondary ticketing services for major concert venues.

165.   Defendants' conduct has affected a not insubstantial amount of interstate commerce in the provision of primary ticketing services for major concert venues and secondary ticketing services for major concert venues.

166.   Defendants' conduct has had an anticompetitive effect in the relevant markets for primary ticketing services for major concert venues and secondary ticketing services for major concert venues.

COMPLAINT

<u>Vertically-arranged boycotts</u>

167.   Defendants have induced and coerced venues to boycott Ticketmaster's competitors for the provision of primary ticketing services.

168.   By way of, *inter alia*, exclusive dealing contracts with major concert venues and misuse of Ticketmaster's conditional license, Defendants have agreed with, induced, and/or coerced ticket brokers and other ticket resellers to boycott Ticketmaster's competitors for the provision of secondary ticketing services.

169.   By way of, *inter alia*, building in and applying technological limitations on primary ticket transferability, Defendants have agreed with and/or coerced artists into preventing primary ticket purchasers from working with other secondary ticketing service providers.

170.   Defendants' conduct has foreclosed access to the relevant market for primary ticketing services for major concert venues, which is necessary to enable Ticketmaster's primary ticketing service competitors to compete.

171.   Defendants' conduct has foreclosed access to the relevant market for secondary ticketing services for major concert venues, which is necessary to enable Ticketmaster's secondary ticketing service competitors to compete.

172.   Ticketmaster possesses a dominant position in the relevant markets for primary ticketing services for major concert venues and secondary ticketing services for major concert venues.

173.   Defendants' conduct is not justified, because their conduct is not intended to enhance overall efficiency and to make the relevant markets more efficient.

174.   Defendants' conduct has had a substantial effect on interstate commerce.

175.   Live Nation Entertainment promoted, encouraged, aided, assisted, and/or directed Ticketmaster's conduct alleged above.   Live Nation Entertainment also independently participated in the anticompetitive scheme as alleged herein.

176.   Plaintiffs have been or will be injured in their property as a result of Defendants' conduct.

COMPLAINT

177.   Plaintiffs have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiffs have been and will be injured by the harm to competition as a result of Defendants' conduct.

## SECOND CLAIM FOR RELIEF

### (Attempted Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2)

### (against All Defendants)

178.   Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

179.   With respect to the relevant market for primary ticketing services for major concert venues, Defendants have engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to leveraging, coercion of disloyal customers and others, tying arrangements, long-term exclusive dealing arrangements, and vertically-arranged boycotts.

180.   With respect to the relevant market for secondary ticketing services for major concert venues, Defendants have engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to exclusive dealing contracts with major concert venues that include the exclusive right to sell all tickets, including secondary tickets, for said concerts, misusing the conditional license granted to use Ticketmaster's online ticketing platform, limiting primary ticket transferability through technological means, agreeing with and/or coercing ticket brokers to agree to list primary tickets on Ticketmaster's secondary platform instead of competitors' secondary ticket platforms, and agreeing with and/or coercing artists into limiting primary ticket transferability except on Ticketmaster's secondary ticketing platform, as well as the types of anticompetitive conduct referenced in the prior paragraph.

181.   Defendants' conduct has had an anticompetitive effect in the relevant markets for primary and secondary ticketing services for major concert venues.

182.   Defendants' conduct has no legitimate business purpose or procompetitive effect.

183.   Defendants have engaged in that conduct with the specific intent of monopolizing the relevant markets for primary and secondary ticketing services.

184.   Defendants have engaged in that conduct with a dangerous probability of monopolizing each of the relevant markets for primary and secondary ticketing services for major concert venues.

185.   Defendants' conduct has had a substantial effect on interstate commerce.

186.   Live Nation Entertainment promoted, encouraged, aided, assisted, and/or directed Ticketmaster's conduct alleged above.   Live Nation Entertainment also independently participated in the anticompetitive scheme as alleged herein.

187.   Plaintiffs have been or will be injured in their property as a result of Defendants' conduct.

188.   Plaintiffs have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiffs have been and will be injured by the harm to competition as a result of Defendants' conduct.

### THIRD CLAIM FOR RELIEF

### (Sherman Act, Section 1, 15 U.S.C. § 1)

### (against All Defendants)

189.   Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

190.   As alleged above, Defendants and various venues, ticket brokers, artists, and others have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for Ticketmaster in the relevant markets for primary and secondary ticketing services for major concert venues.

191.   As alleged above, Defendants have induced or coerced various major concert venues, ticket brokers, artists, and others to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for

Ticketmaster in the relevant markets for primary and secondary ticketing services for major concert venues.

192.   As alleged above, Defendants have conditioned the provision of services and access to venues over which they hold market power on the boycotting of competing primary ticketing service providers for major concert venues and the use of Ticketmaster's secondary ticketing services for major concert venues.

193.   These contracts, combinations, or conspiracies include but are not limited to long-term exclusive dealing arrangements, tying arrangements, and vertically-arranged boycotts.

194.   Defendants' conduct has had an anticompetitive effect in the relevant markets for primary and secondary ticketing services for major concert venues.

195.   Defendants' conduct has no legitimate business purpose or procompetitive effect.

196.   There are less restrictive alternatives to the restraints Defendants imposed on the relevant markets for primary and secondary ticketing services for major concert venues.

197.   Defendants' conduct has had a substantial effect on interstate commerce.

198.   Live Nation Entertainment promoted, encouraged, aided, assisted, and/or directed Ticketmaster's conduct alleged above.   Live Nation Entertainment also independently participated in the anticompetitive scheme as alleged herein.

199.   Plaintiffs have been or will be injured in their property as a result of Defendants' conduct.

200.   Plaintiffs have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.   Plaintiffs have been and will be injured by the harm to competition as a result of Defendants' conduct.

## **PRAYER FOR RELIEF**

201.   Wherefore, Plaintiffs request the following relief:

(a)   Damages in an amount to be determined;

-69-

   (b)  Treble damages;

   (c)  Attorneys' fees;

   (d)  Costs;

   (e)  Pre-judgment and post-judgment interest at the maximum rate permitted under the law;

   (f)  Punitive damages;

   (g)  Injunctive relief, including but not limited to an injunction barring Defendants' conduct alleged in the Complaint;

   (h)  Declaratory relief, including but not limited to a declaration and judgment that Defendants' conduct alleged in the Complaint violates the laws alleged in the Complaint; and

   (i)  Such other and further relief as the Court deems proper and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED:  April 28, 2020   QUINN EMANUEL URQUHART & SULLIVAN, LLP


By */s/ Frederick A. Lorig*
  Frederick A. Lorig
  Kevin Y. Teruya
  Adam B. Wolfson

  Attorneys for Plaintiffs Olivia Van Iderstine and Mitch Oberstein

-70-