1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
  Daniel M. Wall (Bar No. 102580)
    *dan.wall@lw.com*
  Timothy L. O'Mara (Bar No. 212731)
    *tim.o'mara@lw.com*
  Andrew M. Gass (Bar No. 259694)
    *andrew.gass@lw.com*
  Kirsten M. Ferguson (Bar No. 252781)
    *kirsten.ferguson@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone:  +1.415.391.0600
Facsimile:  +1.415.395.8095

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mitch Oberstein, Gary Matty, and Sophie Burke, on behalf of themselves and all those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> Live Nation Entertainment, Inc., and Ticketmaster LLC, <br><br> Defendants. | Case No. 2:20-cv-03888-GW-GJS <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' AMENDED MOTION TO COMPEL ARBITRATION** <br><br> The Honorable George H. Wu <br><br> Hearing Date: TBD <br><br> Hearing Time: 8:30 a.m. <br><br> Courtroom: 9D, 9th Floor |

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................. 1

II. FACTUAL BACKGROUND ................................................................ 2

    A. The Relevant Terms ................................................................... 2

    B. To Create an Account, Sign In, and Purchase Tickets on Defendants' Websites, Users Must Affirmatively Agree to the Terms .................................................................................... 3

        1. Sign In ............................................................................ 4

        2. Purchase ........................................................................ 5

    C. Plaintiffs' Claims ...................................................................... 5

    D. Plaintiffs' Account Sign-Ins and Ticket Purchases ................. 6

        1. Plaintiff Mitch Oberstein .............................................. 6

        2. Plaintiff Sophie Burke .................................................. 7

        3. Plaintiff Gary Matty ..................................................... 7

    E. Plaintiffs' Agreement to the Terms .......................................... 8

        1. Plaintiff Mitch Oberstein .............................................. 8

        2. Plaintiff Sophie Burke .................................................. 9

        3. Plaintiff Gary Matty ................................................... 11

III. LEGAL STANDARD ........................................................................ 13

IV. ARGUMENT ..................................................................................... 14

    A. The Terms Constitute Valid, Enforceable Agreements ........... 14

    B. The Parties Clearly and Unmistakably Delegated Arbitrability to the Arbitrator .............................................. 20

    C. The Arbitration Clause Plainly Encompasses the Dispute at Issue .................................................................................... 22

    D. This Action Should Be Dismissed .......................................... 23

V. CONCLUSION .................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ajzenman v. Office of Commissioner of Baseball*,
  No. CV 20-3643, 2020 WL 6031899
  (C.D. Cal. Sept. 14, 2020) ................................................................. 1, 3, 9, 12, 18

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) ......................................................................................... 13

*Boucher v. All. Title Co., Inc.*,
  25 Cal. Rptr. 3d 440 (Cal. Ct. App. 2005) ......................................................... 19

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) ........................................................................... 14

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
  207 F.3d 1126 (9th Cir. 2000) .............................................................. 13, 22, 23

*Chung v. Nemer*,
  No. C 12-4608, 2012 WL 5289414 (N.D. Cal. Oct. 25, 2012) .......................... 21

*Crawford v. Beachbody, LLC*,
  No. 14-cv-1583, 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) .......................... 15

*DeVries v. Experian Info. Sols., Inc.*,
  No. 16-cv-02953, 2017 WL 733096 (N.D. Cal. Feb. 24, 2017) ........................ 15

*Dickey v. Ticketmaster LLC*,
  No. 18-CV-09052-GW-GJS, 2019 WL 9096443
  (C.D. Cal. March 12, 2019) .................................................... 1, 3, 14, 16, 17, 21

*Druyan v. Jagger*,
  508 F. Supp. 2d 228 (S.D.N.Y. 2007) ............................................................... 18

*Fteja v. Facebook, Inc.*,
  841 F. Supp. 2d 829 (S.D.N.Y. 2012) ............................................................... 16

*Goza v. Multi-Purpose Civic Ctr. Facilities Bd. for Pulaski Cty.*,
  No. 12-CV-6125, 2014 WL 3672128 (W.D. Ark. July 23, 2014) .............. 11, 18

*Graf v. Match.com, LLC*,
No. CV 15-3911, 2015 WL 4263957 (C.D. Cal. July 10, 2015) ...................... 15

*Hansen v. Ticketmaster Entertainment, Inc.*,
No. 20-cv-02685, 2020 WL 7319358
(N.D. Cal. Dec. 11, 2020).................................................1, 3, 9, 12, 18

*Hart v. Charter Commc'ns, Inc.*,
814 Fed. Appx. 211 (9th Cir. 2020) .................................................. 19

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019) ........................................................... 14, 20

*Himber v. Live Nation Worldwide, Inc.*,
No. 16-CV-5001, 2018 WL 2304770 (E.D.N.Y. May 21, 2018) ........ 1, 3, 18, 21

*In re Holl*,
925 F.3d 1076 (9th Cir. 2019)...................................................... 18, 19

*Johnmohammadi v. Bloomingdale's, Inc.*,
755 F.3d 1072 (9th Cir. 2014)....................................................... 23

*Johnson v. Oracle Am., Inc.*,
No. 17-cv-05157, 2017 WL 8793341 (N.D. Cal. Nov. 17, 2017) .................... 21

*Lee v. Ticketmaster L.L.C.*,
817 Fed. Appx. 393 (9th Cir. 2020) ...................................1, 3, 9, 10, 11, 12, 17

*Lee v. Ticketmaster L.L.C.*,
No. 3:18-cv-05987-VC, 2019 WL 9096442 (N.D. Cal. Apr. 1,
2019), *aff'd*, 817 Fed. Appx. 393 (9th Cir. 2020) ............................. 1, 16, 17, 22

*Legnaioli v. Chrysler Capital, LLC*,
No. EDCV 15-00744, 2015 WL 12765468
(C.D. Cal. June 9, 2015)........................................................... 23

*McLeod v. Ford Motor Co.*,
No. EDCV 04-1255-VAP-SGL, 2005 WL 3763354
(C.D. Cal. Apr. 14, 2005) ......................................................... 19

*Mims v. Davison Design & Dev., Inc.*,
No. EDCV 16-92, 2016 WL 10771297 (C.D. Cal. Apr. 14, 2016) .................... 23

*Mohamed v. Uber Techs., Inc.*,
   848 F.3d 1201 (9th Cir. 2016) ........................................................................ 21

*Momot v. Mastro*,
   652 F.3d 982 (9th Cir. 2011) .......................................................................... 21

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ........................................................................................... 13

*Moule v. UPS*,
   No. 1:16-cv-00102, 2016 WL 3648961 (E.D. Cal. July 7, 2016) ............... 15, 16

*Naria v. Trover Sols., Inc.*,
   967 F. Supp. 2d 1332 (N.D. Cal. 2013) .......................................................... 19

*Nevarez v. Forty Niners Football Co., LLC*,
   No. 16-CV-07013, 2017 WL 3492110
   (N.D. Cal. Aug. 15, 2017) ....................................................... 1, 3, 17, 22

*Peterson v. Lyft*,
   No. 16-cv-07343, 2018 WL 6047085
   (N.D. Cal. Nov. 19, 2018) ............................................................................. 23

*Rent-A-Center, West, Inc. v. Jackson*,
   561 U.S. 63 (2010) ......................................................................................... 14

*Rodriguez v. Experian Servs. Corp.*,
   No. CV 15-3553-R, 2015 WL 12656919
   (C.D. Cal. Oct. 5, 2015) ................................................................................. 15

*Saizhang Guan v. Uber Techs., Inc.*,
   236 F. Supp. 3d 711 (E.D.N.Y. 2017) ............................................................ 16

*Simula, Inc. v. Autoliv, Inc.*,
   175 F.3d 716 (9th Cir. 1999) .......................................................................... 13

*Swift v. Zynga Game Network, Inc.*,
   805 F. Supp. 2d 904 (N.D. Cal. 2011) ........................................................... 15

*Ticketmaster Corp. v. Tickets.com, Inc.*,
   No. CV 997654, 2003 WL 21406289 (C.D. Cal. Mar. 7, 2003) ...................... 18

*Ticketmaster LLC v. RMG Techs., Inc.*,
   507 F. Supp. 2d 1096 (C.D. Cal. 2007) .......................................................... 18

*Tuminello v. Richards*,
    504 F. App'x 557 (9th Cir. 2013) ...................................................................... 21

**STATUTES**

9 U.S.C. § 2 .......................................................................................................... 13

**RULES**

JAMS Rule 8 .......................................................................................................... 20

## I.  INTRODUCTION

Plaintiffs Mitch Oberstein, Gary Matty, and Sophie Burke brought this putative class action against Defendants Ticketmaster L.L.C. ("Ticketmaster") and Live Nation Entertainment, Inc. ("Live Nation") for alleged damages related to tickets they purchased from Ticketmaster and Live Nation's websites.  However, Plaintiffs agreed on numerous occasions to arbitrate any disputes related to products sold or distributed by Defendants, which includes the claims in this case.  For instance, Plaintiffs affirmatively agreed to be bound by Ticketmaster and Live Nation's Terms of Use (the "Terms") each time they signed in to their Ticketmaster accounts, *and* each time they purchased tickets.  Those Terms contain a mandatory arbitration clause which broadly applies to nearly all disputes and claims, including any claims related to tickets sold or distributed by Ticketmaster or Live Nation.

Numerous courts—including this Court and the Ninth Circuit—have enforced the very Terms at issue here, based on the same and similar notices provided to Plaintiffs when they made their purchases.  *See, e.g.*, *Hansen v. Ticketmaster Entertainment, Inc.*, No. 20-cv-02685, 2020 WL 7319358, at *1, *5 (N.D. Cal. Dec. 11, 2020); *Ajzenman v. Office of Commissioner of Baseball*, No. CV 20-3643, 2020 WL 6031899, at *2, *4 (C.D. Cal. Sept. 14, 2020); *Dickey v. Ticketmaster LLC*, No. 18-CV-09052-GW-GJS, 2019 WL 9096443, at *5-7, *10 (C.D. Cal. March 12, 2019); *Lee v. Ticketmaster L.L.C.*, No. 3:18-cv-05987-VC, 2019 WL 9096442, at *1 (N.D. Cal. Apr. 1, 2019), *aff'd*, 817 Fed. Appx. 393 (9th Cir. 2020); *Nevarez v. Forty Niners Football Co., LLC*, No. 16-CV-07013, 2017 WL 3492110, at *7-10 (N.D. Cal. Aug. 15, 2017); *Himber v. Live Nation Worldwide, Inc.*, No. 16-CV-5001, 2018 WL 2304770, at *3-6 (E.D.N.Y. May 21, 2018); *see also infra* Section IV (collecting cases enforcing arbitration clauses in terms of use exactly like those presented to and accepted by Plaintiffs).  The Court should apply the same law, to the same facts, to reach the same result here.  There is no question that Plaintiffs accepted the Terms and arbitration clause, and the arbitration clause clearly and unmistakably delegates

all questions relating to the interpretation, applicability, enforceability, or formation of the agreement to the arbitrator.  Plaintiffs' claims against Ticketmaster and Live Nation are therefore subject to binding arbitration, and this case should be dismissed or, in the alternative, stayed.

## II. FACTUAL BACKGROUND

### A.    The Relevant Terms

Since June 14, 2011, the Terms have contained a provision by which users expressly agree to submit their claims to binding arbitration.  Decl. of Kimberly Tobias in Supp. of Am. Mot. to Compel Arbitration ("Tobias Decl.") ¶¶ 49-52 & Exs. 41-62.  The current Terms provide that:

> **ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO YOUR USE OF THE SITE, OR TO PRODUCTS OR SERVICES SOLD, DISTRIBUTED, ISSUED, OR SERVICED BY US OR THROUGH US, WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION, RATHER THAN IN COURT** ….

> The arbitration agreement in these Terms is governed by the Federal Arbitration Act (FAA), including its procedural provisions, in all respects.  This means that the FAA governs, among other things, the interpretation and enforcement of this arbitration agreement and all of its provisions, including, without limitation, the class action waiver discussed below.  State arbitration laws do not govern in any respect.

> This arbitration agreement is intended to be broadly interpreted and will survive termination of these Terms.  The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable ….

> The arbitration will be conducted by JAMS under its Streamlined Arbitration Rules and Procedures ….

> We each agree that the arbitrator may not consolidate more than one person's claims and may not otherwise preside over any form of a representative or class proceeding, and that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action.  **YOU AGREE TO WAIVE ANY RIGHT TO A JURY TRIAL OR TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION**.

*Id.* Exs. 41-42.  Prior versions were substantially similar.  *Id.* Exs. 43-62.

The recent versions of the Terms (which, as explained below, Plaintiffs Oberstein, Burke, and Matty each have assented to) state in the very first paragraph that they govern a customer's "use of Live Nation and Ticketmaster's sites and mobile applications – including without limitation www.livenation.com (https://www.livenation.com), www.ticketmaster.com (https://www.ticketmaster.com), and www.ticketexchangebyticketmaster.com (https://www.ticketexchangeby ticketmaster.com) – (collectively, the 'Site'), and your purchase, possession, or use of any Live Nation or Ticketmaster tickets, products, or services." *Id.* Exs. 41-42; *see also* Exs. 43-45, 53-55 (substantially similar language).

## B. To Create an Account, Sign In, and Purchase Tickets on Defendants' Websites, Users Must Affirmatively Agree to the Terms

To make even a single purchase on Defendants' websites, users must agree to the Terms at numerous, distinct times—including at account creation, account sign-in, and ticket purchase. Tobias Decl. ¶¶ 4-19, 22-28, 31-37, 40-46. In addition, at the bottom of virtually every Live Nation and Ticketmaster website page that users navigate in the ticket selection and purchase process, there is a notice that, by using the site, users are agreeing to the Terms. *Id.* ¶¶ 20-21, 29-30, 38-39, 47-48. Courts have found *each* of these points of assent to be valid and binding. *See, e.g.*, *Hansen*, 2020 WL 7319358, at *1, 5 (Ticketmaster "Sign In" page); *Ajzenman*, 2020 WL 6031899, at *2, 4 (Ticketmaster "Sign In" and purchase pages); *Dickey*, 2019 WL 9096443, at *5-7 (Ticketmaster "Sign Up" page); *Lee*, 817 Fed. Appx. at 394-95 (Ticketmaster "Sign In" and purchase pages); *Nevarez*, 2017 WL 3492110, at *7-10 (Ticketmaster account creation, sign-in, and purchase pages); *Himber*, 2018 WL 2304770, at *5 (*inter alia*, notices at bottom of Live Nation webpages).

Here, Plaintiff Oberstein affirmatively accepted the Terms (and the arbitration clause therein) when he created his account in 2016, and, subsequently, each time he signed in to his account, and each time he purchased tickets. *See* Decl. of Shawn Moon in Supp. of Am. Mot. to Compel Arbitration ("Moon Decl.") ¶¶ 5, 7; Tobias

Decl. ¶¶ 4-6, 22-23, 31-32, 40-41.  By contrast, Plaintiffs Burke and Matty created accounts in 2008 and 2006, respectively—before the Terms contained an arbitration clause—and so did not agree to arbitrate at that time.  *See* Moon Decl. ¶¶ 11, 17. Subsequently, however, Burke and Matty (like Oberstein) affirmatively accepted versions of the Terms that contained the arbitration clause; they did so, repeatedly, on the numerous occasions when they signed in to their accounts and purchased tickets.  *See id.*; Tobias Decl. ¶ 4.  In order to streamline the factual discussion and analysis, therefore, this motion will focus on the common denominator among the three named Plaintiffs: their repeated acceptance of the Terms (and the arbitration clause therein) at the point of sign-in and the point of purchase.

### 1.    **Sign In**

In order to access their accounts, and before they can purchase a ticket, users are required to sign into their accounts.  Tobias Decl. ¶¶ 8, 25, 34, 43.  For example, on the current Ticketmaster desktop site, users must input their user credentials and click a "Sign In" button, at which point they are notified that: "By continuing past this page, you agree to the **Terms of Use** . . . ."  *Id.* ¶ 8 & Ex. 4.  The words "**Terms of Use**" appear in bold, color-contrasting text, and hyperlink to the full text of the Terms:



*Id.*  While the look and feel of the Ticketmaster desktop "Sign In" page has changed slightly over time, users have been required to accept the Terms with a substantially similar notice at sign-in since at least 2010.  *Id.* ¶¶ 9-13 & Exs. 5-9.  Similarly, the Ticketmaster mobile site has required users to accept the Terms when signing in since at least 2012, *id.* ¶¶ 24-26 & Exs. 22-23, the Live Nation desktop site has

required users to accept the Terms at sign-in since at least 2010, *id.* ¶¶ 33-35 & Exs. 30-31, and the Live Nation mobile site has required users to accept the Terms at sign-in since at least 2012, *id.* ¶¶ 42-44 & Exs. 31, 37.  Thus, each time Plaintiffs signed in to their accounts, *see infra* Sections II.D, II.E, they affirmatively agreed to the Terms.

### 2.   Purchase

To complete the final step of purchasing a ticket, users are required to fill out payment and billing information and click a "Place Order" button, at which point they are notified: "By continuing past this page and clicking 'Place Order', you agree to our **Terms of Use**."  *Id.* ¶ 14 & Ex. 10.  The words "**Terms of Use**" appear in bold, color-contrasting text, and hyperlink to the full text of the Terms, as shown here on the June 2020 Ticketmaster desktop site:



*Id.*  While the look and feel of the Ticketmaster desktop purchase page has changed slightly over time, it has required users to accept the Terms when placing orders since at least 2006.  *Id.* ¶¶ 15-19 & Exs. 11-18.  Similarly, the Ticketmaster mobile site and the Live Nation desktop site have required users to accept the relevant Terms on the purchase page since at least 2010.  *Id.* ¶¶ 27-28 & Exs. 24-25 (Ticketmaster mobile site), ¶¶ 36-37 & Exs. 32-33 (Live Nation desktop site).  Thus, each time Plaintiffs purchased the tickets described below, *see infra* Sections II.D, II.E, they affirmatively agreed to the Terms.

### C.   Plaintiffs' Claims

Plaintiffs purport to bring a class action on behalf of two putative sub-classes of consumers who "purchased a primary ticket" or "a secondary ticket" from

Defendants.  Am. Compl. ¶ 125, ECF No. 81.  Plaintiffs claim that Ticketmaster and its parent, Live Nation, violated the Sherman Act by "engaging in anticompetitive exclusive dealing with major concert venue operators … as well as numerous other unfair and anticompetitive acts … that are aimed at eliminating and/or minimizing all competition, both in primary ticketing services and, more recently, secondary ticketing services."  *Id.* ¶ 7.  According to Plaintiffs, this alleged anticompetitive conduct results in "extraordinarily high fees" for tickets sold by Ticketmaster.  *Id.* ¶ 6; *see also id.* ¶¶ 120, 136.  Plaintiffs therefore seek, *inter alia*, "to recover the damages they suffered from paying supracompetitive fees on primary and secondary ticket purchases from Ticketmaster's online platforms."  *Id.* ¶ 1.

### D.   Plaintiffs' Account Sign-Ins and Ticket Purchases

#### 1.   *Plaintiff Mitch Oberstein*

Plaintiff Mitch Oberstein alleges that he "is a resident of Los Angeles, California," and that he "purchased primary and secondary tickets and paid associated fees for primary and secondary ticketing services for events at major concert venues from Defendants' online platform within the class period," i.e., between 2010 and the present.  *Id.* ¶¶ 20, 125.[1]  Defendants' records confirm that, between 2010 and the present, Oberstein repeatedly signed in to his accounts, and repeatedly purchased tickets—on more than 40 separate occasions—from Defendants' websites.  Moon Decl. ¶¶ 5, 7.  For example, Oberstein's most recent purchase on the Ticketmaster desktop site occurred in 2020, and his most recent purchase on the Ticketmaster mobile site occurred in 2019:

- On February 12, 2020, Oberstein used the Ticketmaster desktop site to purchase primary tickets to Local Natives to be held at the Greek Theatre on May 20, 2020.

---

[1]   Plaintiffs define "primary ticketing" as "the initial distribution of tickets for a show" and "secondary ticketing" as "the resale of previously-purchased tickets, typically at a higher price." Am. Compl. ¶ 2 n.1.

- On August 21, 2019, Oberstein used the Ticketmaster mobile site to purchase primary tickets to Sara Bareilles to be held at Cal Coast Credit Union Open Air Theatre at SDSU on October 29, 2019.

*Id.* ¶ 5(a), (b).  Defendants' records further show that two accounts were used to make Oberstein's purchases, the most recent of which was created on November 30, 2016.  *Id.* ¶ 7.

### 2. *Plaintiff Sophie Burke*

Plaintiff Sophie Burke alleges that she "is a resident of Massachusetts," and that she "purchased primary and secondary tickets and paid associated fees for primary and secondary ticketing services for events at major concert venues from Defendants' online platform within the class period," i.e., between 2010 and the present.  Am. Compl. ¶¶ 22, 125.  Defendants' records confirm that, between 2010 and the present, Burke repeatedly signed in to her online account, and repeatedly purchased tickets—on six separate occasions—from the Ticketmaster desktop site.  Moon Decl. ¶¶ 10, 12.  For example, Burke's two most recent purchases occurred in 2018:

- On July 18, 2018, Burke purchased secondary tickets to Chris Stapleton to be held at Madison Square Garden on November 2, 2018.
- On October 10, 2018, Burke purchased primary tickets to Mumford & Sons – Delta Tour 2018/19 to be held at TD Garden on December 9, 2018.

*Id.* ¶ 10(e), (f).  Defendants' records demonstrate that one account was used to make Burke's purchases; it was created on June 14, 2008.  *Id.* ¶ 11.

### 3. *Plaintiff Gary Matty*

Plaintiff Gary Matty alleges that he "is a resident of West Virginia," and that he "purchased primary tickets and paid associated fees for primary ticketing services for events at major concert venues from Defendants' online platform within the class period," i.e., between 2010 and the present.  Am. Compl. ¶¶ 21, 125.  Defendants'

records confirm that, between 2010 and the present, Matty repeatedly signed in to his account, and repeatedly purchased tickets—on two separate occasions—from the Ticketmaster desktop site:

- On December 12, 2012, Matty purchased primary tickets to Fleetwood Mac Live 2013 to be held at Nationwide Arena on April 4, 2013.
- On February 19, 2016, Matty purchased primary tickets to Pittsburg Penguins vs. Arizona Coyotes to be held at PPG Paints Arena on February 29, 2016.

Moon Decl. ¶¶ 15, 18.  Defendants' records demonstrate that one account was used to make Matty's purchases; it was created on September 30, 2006.  *Id.* ¶ 17.

## E.    Plaintiffs' Agreement to the Terms

As explained above, Plaintiffs Oberstein, Burke, and Matty repeatedly signed in to their accounts, and repeatedly purchased tickets on Defendants' platforms.  To purchase tickets on *any* of these platforms, Plaintiffs would have had to go through the steps described in Section II.B, *supra*, assenting to the Terms each time they signed in, and each time they purchased tickets.  To streamline the factual discussion and analysis—since Plaintiffs are repeat users of Defendants' websites, *see* Moon Decl. ¶¶ 5, 7, 10, 12, 15, 18—this motion will focus on Plaintiffs' recent interactions with Defendants' websites.

### 1.    *Plaintiff Mitch Oberstein*

In addition to accepting the Terms when he created an account in 2016 (*see* Tobias Decl. ¶¶ 5-6, 22-23, 31-32, 40-41; Moon Decl. ¶ 7), Plaintiff Oberstein affirmatively assented to the Terms on numerous occasions when he signed in to his account and made purchases (including, for example, *more than 60 times* since 2013).  *See* Moon Decl. ¶ 5.  With each purchase, Oberstein agreed to the Terms at both sign-in *and* purchase.  To illustrate this, it is helpful to walk through Oberstein's most recent ticket purchase, which occurred in February 2020.  When Oberstein bought tickets on the Ticketmaster desktop site at that time, he assented to the Terms

when he clicked the "Sign In" and "Place Order" buttons depicted below:



Tobias Decl. ¶¶ 9, 14 & Exs. 5, 10.  Immediately above each button that Oberstein clicked was a clear notice that, by clicking those buttons, he was agreeing to the hyperlinked Terms—which contained a mandatory arbitration clause. *Id.* ¶¶ 4, 9, 14 & Exs. 5, 10.  Similarly, when Oberstein bought tickets on the Ticketmaster mobile site in August 2019, he assented to the Terms by clicking nearly identical "Sign In" and "Place Order" buttons, at which point he was notified that he was agreeing to the hyperlinked Terms by clicking those buttons. *Id.* ¶¶ 26, 28 & Exs. 23, 25.  Last year, *two courts* held that the exact same notice that Oberstein saw on Ticketmaster's desktop site sign-in page in February 2020 was sufficient to bind users to the Terms. *Hansen*, 2020 WL 7319358, at *1, *5; *Ajzenman*, 2020 WL 6031899, at *2, *4.  Further, the Ninth Circuit recently held (on *de novo* review) that substantially identical notices on Ticketmaster's sign-in and purchase pages were sufficient to bind users (like Oberstein) to the Terms. *Lee*, 817 Fed. Appx. at 394-95.

### 2.   *Plaintiff Sophie Burke*

Plaintiff Burke also affirmatively assented to the Terms *at least 14 times* when she signed in to her account and made purchases. *See* Moon Decl. ¶¶ 10, 12.  Burke's most recent purchases (in July and October 2018) are illustrative.  When Burke

bought tickets on the Ticketmaster desktop site in July 2018, she assented to the Terms when she clicked the "Sign In" and "Place Order" buttons, both depicted below:





Tobias Decl. ¶¶ 10, 15 & Exs. 6, 11.  As the screenshots show, each page clearly notified Burke that, by clicking the "Sign In" and "Place Order" buttons, she was agreeing to the hyperlinked Terms—which contained a mandatory arbitration clause. *Id*. ¶¶ 4, 10, 15 & Exs. 6, 11.  When Burke subsequently purchased tickets on the Ticketmaster desktop site in October 2018, she again assented to the Terms when she was presented with the exact same notices, and clicked the exact same buttons, as depicted above.  *See id.* ¶¶ 10, 15 & Exs. 6, 11; Moon Decl. ¶ 10(f); *see also* Tobias Decl. ¶ 8 & Ex. 4; Moon Decl. ¶ 12(a) (demonstrating Burke's additional assent to the Terms when she signed in to the Ticketmaster desktop site on January 6, 2021).  The Ninth Circuit recently reviewed, *de novo*, the exact same notices that Burke saw on Ticketmaster's website in 2018, and held that they were sufficient to bind users (like Burke) to the Terms and the arbitration agreement therein.  *Lee*, 817 Fed. Appx. at 394-95.

MEM. OF POINTS & AUTHS. ISO
AM. MOT. TO COMPEL ARBITRATION
CASE NO. 2:20-CV-03888-GW-GJS

### 3.     *Plaintiff Gary Matty*

Plaintiff Matty also affirmatively assented to the Terms *at least five times* when he signed in to his account and made purchases on the Ticketmaster desktop site.  *See* Moon Decl. ¶¶ 15, 18.  For example, when Matty bought tickets on the Ticketmaster desktop site in December 2012, he agreed to the Terms twice: at sign in and purchase.  Matty first assented to the Terms by clicking the "Accept and Continue" button depicted on the sign-in page below, above which was a clear notice that he was agreeing to the hyperlinked Terms by clicking that button:



Tobias Decl. ¶ 13 & Ex. 9.  Matty then (again) assented to the Terms a second time, on the purchase page, which informed him that, "[b]y clicking the 'Submit Order' button, you are agreeing to the Ticketmaster **Purchase Policy**…."  *Id*. ¶ 19 & Ex. 17.   The contrasting words "**Purchase Policy**" hyperlinked to the full text of Ticketmaster's Purchase Policy, which explicitly stated (in the first paragraph) that users are subject to the "**Terms of Use** which govern your use of our Site"; the words "**Terms of Use**" hyperlinked to the full text of the Terms.  *Id.* ¶ 19 & Exs. 17-18; *see also id*. ¶¶ 12, 17 & Exs. 8, 13-14 (showing that Matty also accepted the Terms when he purchased tickets in 2016).  Another court has reviewed Ticketmaster's notices that are substantially identical to the ones that Plaintiff Matty saw in 2012, and concluded that they were sufficient to bind users to the Terms.  *See Goza v.*

1   *Multi-Purpose Civic Ctr. Facilities Bd. for Pulaski Cty.*, No. 12-CV-6125, 2014 WL

2   3672128, at *3 (W.D. Ark. July 23, 2014).

3        Since Matty's purchases are not as recent as Oberstein or Burke's purchases,

4   it is helpful to also walk-through Matty's most recent sign-in to his account: on

5   December 23, 2020, Matty signed in to his account on the Ticketmaster mobile site

6   (but did not purchase any tickets); at that time, he assented to the Terms when he

7   clicked this "Sign In" button:

8
9
10
11
12
13
14
15
16
17
18



19   Tobias Decl. ¶ 25 & Ex. 22; Moon Decl. ¶ 18.  As the screenshot shows, immediately

20   above the "Sign In" button Matty clicked was a clear notice that, by signing in, he

21   was agreeing to the hyperlinked Terms—which contained a mandatory arbitration

22   clause.  Tobias Decl. ¶¶ 4, 25 & Ex. 22.  Last year, *two courts* held that the exact

23   same notice on Ticketmaster's desktop site was sufficient to bind users to the Terms.

24   *See Hansen*, 2020 WL 7319358, at *1, *5; *Ajzenman*, 2020 WL 6031899, at *2, *4.

25   Further, as discussed above, the Ninth Circuit has held that a substantially identical

26   notice was sufficient to bind users to the Terms.  *Lee*, 817 Fed. Appx. at 394-95.

27
28

MEM. OF POINTS & AUTHS. ISO
AM. MOT. TO COMPEL ARBITRATION
CASE NO. 2:20-CV-03888-GW-GJS

### III.    LEGAL STANDARD

Plaintiffs' claims against Ticketmaster and Live Nation are governed by the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. § 2; Tobias Decl. Exs. 41-62 (current and prior versions of the Terms, stating that the arbitration agreement is governed by the FAA). Under the FAA, an agreement to arbitrate, like the one in the Terms, "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This reflects Congress's intent to enforce agreements to arbitrate, and affirms the principle that federal law strongly favors arbitration. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (reaffirming the "liberal federal policy favoring arbitration," and explaining that "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms") (citations omitted).

Pursuant to the FAA's strong policy favoring arbitration, the court's role is strictly circumscribed when ruling on a motion to compel arbitration. As the Ninth Circuit explained:

> By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. The court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms.

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted; emphasis in original). "The standard for demonstrating arbitrability is not high," and agreements to arbitrate "are to be rigorously enforced." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999). To that end, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

MEM. OF POINTS & AUTHS. ISO AM. MOT. TO COMPEL ARBITRATION CASE NO. 2:20-CV-03888-GW-GJS

The court's inquiry is even more limited where (as here) the parties delegate the power to decide arbitrability to the arbitrator—rather than the court. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). The Supreme Court has repeatedly made clear that "parties may agree to have an arbitrator decide … 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)). "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id.* at 530. When considering whether there is a valid delegation, the court undertakes a limited inquiry into whether the parties "clearly and unmistakably" delegated the power to decide arbitrability to the arbitrator. *Brennan*, 796 F.3d at 1130; *see also Schein*, 139 S. Ct. at 530.

## IV.   ARGUMENT

The FAA requires the Court to enforce the arbitration clause at issue here because the parties entered into valid agreements to arbitrate that clearly and unmistakably delegate the power to decide arbitrability to the arbitrator. In 2019, this Court examined substantially the same user flow and Terms, and correctly concluded that the Terms are valid and enforceable, and that the delegation clause clearly and unmistakably delegates questions of arbitrability to the arbitrator. *See Dickey*, 2019 WL 9096443, at *5-10. The Court should reach the same conclusion here.

### A.   The Terms Constitute Valid, Enforceable Agreements

The Terms constitute enforceable "clickwrap" or "modified clickwrap" agreements—i.e., online agreements that are accepted by clicking a button that is adjacent to a statement indicating that clicking the button constitutes assent to hyperlinked terms. A "clickwrap" agreement "presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the

terms of the license agreement by clicking on an icon." *Crawford v. Beachbody, LLC*, No. 14-cv-1583, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) (citation omitted). A "modified clickwrap" agreement presents a terms of use agreement as part of some other transaction, so that clicking a hyperlinked button both completes a transaction *and* denotes acceptance of any terms of use. *See id*.; *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011).

Courts in this circuit routinely enforce clickwrap and modified clickwrap agreements. *See, e.g.*, *DeVries v. Experian Info. Sols., Inc.*, No. 16-cv-02953, 2017 WL 733096, at *5-7 (N.D. Cal. Feb. 24, 2017) (enforcing arbitration clause where notice above "Submit Secure Order" button informed customers that, by submitting an order, they agreed to the terms); *Crawford*, 2014 WL 6606563, at *3, *8 (enforcing terms where there was a hyperlinked notice in contrasting color immediately above "Place Order" button); *Swift*, 805 F. Supp. 2d at 911-12 (enforcing arbitration clause where plaintiff clicked an "Accept" button that was placed above a hyperlinked statement, which indicated that clicking the button constituted assent to the terms of service); *Moule v. UPS*, No. 1:16-cv-00102, 2016 WL 3648961, at *5 (E.D. Cal. July 7, 2016) (enforcing arbitration clause in terms and conditions where the user had to click a "Yes" button, which was below the following hyperlinked statement: "By clicking the Yes button, you agree to the UPS Tariff/Terms and Conditions"); *Rodriguez v. Experian Servs. Corp.*, No. CV 15-3553-R, 2015 WL 12656919, at *2-3 (C.D. Cal. Oct. 5, 2015) (enforcing arbitration clause in terms of use where the "website contained a hyperlink to the Terms of Use at the bottom of every page and included an express disclosure and acknowledgement, which stated, 'By clicking the button above … you agree to our Terms of Use'"); *Graf v. Match.com, LLC*, No. CV 15-3911, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) (enforcing arbitration clause in terms of use where "all users of the Match.com website … were required to affirmatively agree to the Terms of Use when they clicked on a 'Continue' or other similar button on the registration

page where it was explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use, which were always hyperlinked and available for review").[2]

Here—as in *DeVries*, *Crawford*, and countless other cases—Plaintiffs were required to assent to the Terms at numerous points, including when they signed in to their accounts and placed their orders.  Indeed, it is impossible for a user to purchase tickets from a Ticketmaster or Live Nation site without agreeing to the Terms.  *See supra* Section II.B; Tobias Decl. ¶ 4.  As explained above, users are required to agree to the Terms when (*inter alia*) they sign in to their account and place an order, and the Terms are always hyperlinked and identified in bright, contrasting color.  *See supra* Sections II.B, II.E; Tobias Decl. ¶¶ 4, 7-19, 24-28, 33-37, 42-46.  The law is clear that this provided Plaintiffs with sufficient notice and opportunity to review the Terms, and that, by clicking on the button (e.g., "Sign In" or "Place Order"), they "manifested assent" to those Terms.  *See Moule*, 2016 WL 3648961, at *5.[3]

Numerous courts—*including this one in 2019 <u>and</u> the Ninth Circuit in 2020*—have found that the user flow on Defendants' websites provides reasonable notice of the Terms and creates a binding and enforceable agreement between Defendants and

---

[2]  *See also Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 723-24 (E.D.N.Y. 2017) (enforcing arbitration agreement and collecting cases where courts "have upheld 'Sign-In Wrap' agreements where plaintiffs … clicked a 'Sign Up' or 'Sign In' button where nearby language informed them that clicking the buttons would constitute accepting the terms of service"); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835, 841 (S.D.N.Y. 2012) (enforcing terms of service where, right below the "Sign Up" button, the following was displayed: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service").

[3]  Although Plaintiffs all agreed to the Terms at multiple points in the user flows on Defendants' websites, *see* Tobias Decl. ¶¶ 4-48, the Court need only find that they each assented to the Terms at *one* point in the user flow to conclude that the Terms constitute enforceable agreements.  *See Lee*, 2019 WL 9096442, at *1 n.1 ("Because Lee's assent to the terms on the 'Place Order' page is sufficient to establish that he agreed to arbitrate his claims, the Court need not determine whether Lee's use of other pages on Ticketmaster's website or other resale websites also establish an agreement to arbitrate."); *Dickey*, 2019 WL 9096443, at *7 ("Plaintiff assented to the TOU *at the very least* when facing the Sign Up Screen and clicking the 'Sign Up' button.") (emphasis added).

the consumer.  Users must agree to the Terms at multiple points in the ticket purchase process; courts have found each of those points of assent—independently—to be valid and binding.

For example, in *Lee v. Ticketmaster L.L.C*, the Ninth Circuit found that the plaintiff assented to the Terms each time he clicked the "Sign In" button, and each time he clicked the "Place Order" button, on Ticketmaster's website.  There*, the district court had held that Ticketmaster "presented evidence that [the plaintiff] was required to assent to the terms whenever he placed orders for tickets" because "Ticketmaster provided notice of the terms of use adjacent to the 'Place Order' button, included a hyperlink to the terms in a contrasting color, and informed the user that 'continuing past this page' (i.e., placing an order) would indicate assent to the terms."  2019 WL 9096442, at *1.  The Ninth Circuit reviewed *de novo* and affirmed, finding that the plaintiff "validly assented to Ticketmaster's Terms of Use *both* when "he clicked the 'Sign In' button when signing into his Ticketmaster account, … *as well as* each time he clicked the 'Place Order' button when placing an order for tickets, … where in both contexts, 'Terms of Use' was displayed in blue font and contained a hyperlink to Ticketmaster's Terms."  *Lee*, 817 Fed. Appx. at 394-95 (emphasis added); *see also Dickey*, 2019 WL 9096443, at *5-7 (finding that the plaintiff assented to the Terms at the very least when facing the Sign Up Screen and clicking the 'Sign Up' button" on Ticketmaster's website because "a reasonable user would have had constructive notice that doing so would bind him or her to the TOU").

While *Dickey* and *Lee* are among the most recent federal courts to examine whether Defendants' Terms and arbitration agreement are binding, numerous other federal courts have reached the same conclusion.  In *Nevarez*, the court found that the plaintiff accepted Ticketmaster's Terms "on at least two occasions … by clicking either 'Accept and Continue' or 'Sign In' to register or sign in to their account, and by clicking 'Submit Order' to finalize their purchase," and emphasized that "courts

have 'consistently enforced' arbitration clauses contained within terms of use on similarly designed websites." 2017 WL 3492110, at *8 (citations omitted).  And in *Himber*, which dealt specifically with the Live Nation user flow and Terms, the court concluded that the "website's homepage page and interior pages contain reasonably conspicuous hyperlinks to, and notices concerning applicability of, the Terms of Use" and that "[b]y accessing the website and purchasing tickets thereon," the plaintiff "was on inquiry notice of, and had manifested assent to, the Terms of Use, including the arbitration provision, whether or not he choose to read the accessible Terms of Use." 2018 WL 2304770, at *4-5.[4]

The Ninth Circuit's recent decision in *In re Holl* bolsters the case for enforcing the Terms. 925 F.3d 1076 (9th Cir. 2019).  There, the "UPS My Choice" enrollment page required users to indicate that they agreed to the hyperlinked "UPS My Choice Service Terms" in order to continue with enrollment to the service—but neither the enrollment page *nor* the hyperlinked terms mentioned arbitration. *Id.* at 1080-83.  Rather, the hyperlinked terms incorporated yet another (non-linked) document by reference, which contained the arbitration provision. *Id.* at 1083 ("[L]ocating the arbitration clause … require[d] several steps and a fair amount of web-browsing intuition.").  Still, the Ninth Circuit held that the plaintiff "unequivocally assented to the My Choice Service Terms and those terms clearly incorporated the document

---

[4]  *See also Hansen*, 2020 WL 7319358, at *1, 5 (granting motion to compel arbitration on grounds that the plaintiff "validly assented to the Ticketmaster TOU when he clicked the Sign In button" on Ticketmaster's website); *Ajzenman*, 2020 WL 6031899, at *2, 4 (granting motion to compel arbitration and finding that Ticketmaster's "sign-in and purchase pages created enforceable agreements"); *Goza*, 2014 WL 3672128, at *3 (granting motion to compel arbitration on grounds that "'clickwrap agreements' like [Ticketmaster's] are routinely upheld as valid and enforceable," and that plaintiff had assented to Ticketmaster's Terms of Use when she created her account and purchased tickets); *Druyan v. Jagger*, 508 F. Supp. 2d 228, 237 (S.D.N.Y. 2007) (holding that "Ticketmaster's Terms of Use are sufficiently conspicuous to be binding on the plaintiff as a matter of law."); *Ticketmaster LLC v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1107 (C.D. Cal. 2007) (finding Ticketmaster "highly likely to succeed in showing that Defendant received notice of the Terms of Use and assented to them by actually using the website" because homepage stated: "Use of this website is subject to express *Terms of Use*"); *Ticketmaster Corp. v. Tickets.com, Inc.*, No. CV 997654, 2003 WL 21406289, at *2 (C.D. Cal. Mar. 7, 2003) (same).

containing the arbitration clause in question," and therefore denied the plaintiff's petition for a writ of mandamus challenging the district court's order compelling arbitration.  *Id.* at 1085.  The court noted that while an offeree "is not bound by inconspicuous contractual provisions of which he was unaware … [t]here is no special rule … that an offeror of an adhesive consumer contract specifically highlight or otherwise bring an arbitration clause to the attention of the consumer to render the clause enforceable."  *Id.* at 1083 (citations omitted).  Ticketmaster and Live Nation's user flows are far more conspicuous and clear than those in *Holl* because, at multiple points, users are presented with conspicuous hyperlinks to Terms that contain a bolded arbitration clause.

Finally, the Terms identify the websites and parties to which they apply, and cover the claims against both Defendants at issue in this case.  First, all three Plaintiffs have agreed to the recent versions of the Terms, which clearly state in the very first paragraph that they govern the use of both Ticketmaster and Live Nation's websites.  *See supra* Sections II.A, II.D, II.E; Tobias Decl. Exs. 41-45, 53-55.  Second, in this litigation, Ticketmaster and Live Nation (a wholly owned subsidiary and parent, respectively) may enforce each other's Terms.  In the Ninth Circuit, closely related entities like a parent and subsidiary may enforce the other's arbitration agreement where the "[the plaintiff] sued both [the subsidiary] and [the parent], bringing identical claims against them."  *Hart v. Charter Commc'ns, Inc.*, 814 Fed. Appx. 211, 214 (9th Cir. 2020) (citing *Boucher v. All. Title Co., Inc.*, 25 Cal. Rptr. 3d 440, 444 (Cal. Ct. App. 2005)); *see also McLeod v. Ford Motor Co.*, No. EDCV 04-1255-VAP-SGL, 2005 WL 3763354, at *4 (C.D. Cal. Apr. 14, 2005) (finding parent could enforce arbitration agreements in plaintiffs' contracts with subsidiary because "'[w]hen the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement'") (citation omitted); *Naria v. Trover Sols., Inc.*, 967 F. Supp.

2d 1332, 1339 (N.D. Cal. 2013) (same).

## B. The Parties Clearly and Unmistakably Delegated Arbitrability to the Arbitrator

Once the Court finds that Plaintiffs agreed to be bound by the Terms, it must send this case to arbitration. To the extent Plaintiffs intend to challenge whether their claims fall within the scope of the arbitration provision, or whether the arbitration clause is unenforceable for some reason, the arbitration clause "clearly and unmistakably" provides that those issues must be decided by an arbitrator and not the Court. *See Schein*, 139 S. Ct. at 529, 531 (where there is "clear and unmistakable evidence" that the "contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract," "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless").

The arbitration clause in the Terms specifies that "[t]he arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to *the interpretation, applicability, enforceability or formation of this Agreement*, including, but not limited to any claim that all or part of this Agreement is void or voidable." *See* Tobias Decl. Exs. 41-42 (current Terms) (emphasis added); *id*. Exs. 43-62 (prior versions, materially identical language). There are no carve-outs or exceptions to the delegation clause—the parties delegated to the arbitrator authority over "*all* disputes" relating to the scope and enforceability of the agreement. *Id.* (emphasis added).[5]

---

[5] In addition to the above language, the Terms also specify that arbitration "will be conducted by JAMS under its Streamlined Arbitration Rules and Procedures or, if applicable, its Comprehensive Arbitration Rules and Procedures." *See* Tobias Decl. Exs. 41-42 (current Terms); *id*. Exs. 43-62 (prior versions, materially identical language). JAMS Rule 8 specifies that "[j]urisdictional and *arbitrability disputes*, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, *shall be submitted to and ruled on by the Arbitrator*. The Arbitrator has

1    Courts routinely find that such language is "clear and unmistakable" evidence

2    of the parties' intent to submit the question of arbitrability to the arbitrator.  *See, e.g.*,

3    *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016) (language in

4    arbitration clause stating that "arbitrators [had] the authority to decide issues relating

5    to the 'enforceability, revocability or validity of the Arbitration Provision or any

6    portion of the Arbitration Provision' … 'clearly and unmistakably indicates [the

7    parties'] intent for the arbitrators to decide the threshold question of arbitrability'")

8    (citation omitted); *Tuminello v. Richards*, 504 F. App'x 557, 558 (9th Cir. 2013)

9    (language in arbitration clause stating that arbitrator "shall decide 'any and all

10   controversies … concerning any account(s), transaction, dispute or the construction,

11   performance, or breach of this or any other Agreement' … provides clear and

12   unmistakable evidence that the parties intended the question of arbitrability to be

13   decided in arbitration"); *Momot v. Mastro*, 652 F.3d 982, 987-88 (9th Cir. 2011)

14   (language in arbitration clause stating that arbitrator had the authority to determine

15   the "validity or application of any of the provisions" of the arbitration clause was

16   "clear and unmistakable"); *Chung v. Nemer*, No. C 12-4608, 2012 WL 5289414, at

17   *1 (N.D. Cal. Oct. 25, 2012) (similar).

18       Further, several courts—*including this one*—have found that the Terms'

19   delegation clause "clearly and unmistakably demonstrates the parties' intent to

20   delegate the question of arbitrability to the arbitrator."  *Himber*, 2018 WL 2304770,

21   at *5 (reviewing identical Live Nation arbitration clause); *Dickey*, 2019 WL

22   9096443, at *8 (finding that the Terms' delegation clause "as drafted, meets the

23   requisite 'clear and unmistakable' standard, and the Court therefore may not override

24

---

25   the authority to determine jurisdiction and arbitrability issues as a preliminary
     matter."  O'Mara Decl. Ex. A (JAMS Streamlined Arbitration Rules & Procedures)

26   (emphasis added).  This constitutes further "clear and unmistakable" evidence that
     the parties intended the arbitrator to determine the threshold question of arbitrability.

27   *See, e.g.*, *Johnson v. Oracle Am., Inc.*, No. 17-cv-05157, 2017 WL 8793341, at *6-
     9 (N.D. Cal. Nov. 17, 2017) (enforcing arbitration agreement that incorporated AAA

28   and JAMS rules; finding no distinction between incorporation of AAA rules and
     incorporation of JAMS rules for purposes of assessing intent to arbitrate).

MEM. OF POINTS & AUTHS. ISO
AM. MOT. TO COMPEL ARBITRATION
CASE NO. 2:20-CV-03888-GW-GJS

1   the parties' choice to delegate questions of arbitrability to the arbitrator"); *Nevarez*,

2   2017 WL 3492110, at *14 (same); *Lee*, 2019 WL 9096442, at *1 (same).

3   **C.   The Arbitration Clause Plainly Encompasses the Dispute at Issue**

4   Because the agreement is valid and the delegation clause clearly and

5   unmistakably delegates questions of arbitrability to the arbitrator, the Court's

6   analysis should end here.  If, however, the Court finds the delegation clause does *not*

7   meet the clear and unmistakable standard, the Court should still enforce the parties'

8   arbitration agreement because the arbitration clause plainly encompasses Plaintiffs'

9   claims.  *See Chiron*, 207 F.3d at 1130.

10   The arbitration clause in the Terms broadly encompasses "[a]ny dispute or

11   claim relating in any way to your use of the Site, or to products or services sold,

12   distributed, issued, or serviced by us or through us."   Tobias Decl. Exs. 41-42

13   (current Terms); *see also id*. Exs. 43-62 (prior versions, identical or similar

14   language).  Plaintiffs' claims unquestionably arise out of their purchase of tickets

15   from Defendants' websites, and therefore fall squarely within the arbitration clause.

16   Specifically, Plaintiffs allege that Defendants engaged in conduct that resulted in

17   "artificially high prices for ticketing fees," Am. Compl. ¶ 120, and that, as a result,

18   Plaintiffs and the putative class members were harmed because they paid

19   "supracompetitive fees on primary and secondary ticket purchases from

20   Ticketmaster's online platforms," *id*. ¶ 1.  These claims plainly relate to "products

21   or services sold or distributed by [Ticketmaster or Live Nation] or through

22   [Ticketmaster or Live Nation]."   Tobias Decl. Exs. 41-62.[6]   Because "a valid

---

[6]   Plaintiffs have stated without basis that because their claims reference the
conditional license granted by Defendants to users of their website, they fall within
a limited carve-out in the arbitration clause for claims related to the conditional
license.  This ignores the plain language of the Terms.  The conditional license
allows users to view Defendants' website in exchange for the users' agreement not
to engage in certain defined conduct, such as deploying "viruses," "forging headers,"
or using bots to "circumvent the security structure" of the site. Tobias Decl. Exs. 41-
42.  For claims involving a plaintiff's violation of those specific use restrictions, the
arbitration clause allows suit in court.  *Id.*  Nothing about the complaint in this case
implicates that exception.  Indeed, Plaintiffs cannot explain how the claims in this

1  agreement to arbitrate exists," and that "agreement encompasses the dispute at
2  issue," "the [FAA] requires the court to enforce the arbitration agreement in
3  accordance with its terms."  *Chiron*, 207 F.3d at 1130.

4      **D.   This Action Should Be Dismissed**

5      The Court "may either stay the action or dismiss it outright when, as here, the
6  court determines that all of the claims raised in the action are subject to arbitration."
7  *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1073-74 (9th Cir. 2014).
8  Here, as courts have found in many other cases, dismissal is the most efficient path
9  forward.  *See, e.g.*, *Peterson v. Lyft*, No. 16-cv-07343, 2018 WL 6047085, at *6
10 (N.D. Cal. Nov. 19, 2018) (granting motion to compel arbitration and dismissing
11 case); *Mims v. Davison Design & Dev., Inc.*, No. EDCV 16-92, 2016 WL 10771297,
12 at *5 (C.D. Cal. Apr. 14, 2016) (same); *Legnaioli v. Chrysler Capital, LLC*, No.
13 EDCV 15-00744, 2015 WL 12765468, at *4 (C.D. Cal. June 9, 2015) (same).

14 **V. CONCLUSION**

15     For the foregoing reasons, Defendants respectfully request that the Court
16 compel individual arbitration and dismiss or, in the alternative, stay this action.

17 Dated:  February 19, 2021          Respectfully Submitted,

18                                    LATHAM & WATKINS LLP

19

20                        By:  _Timothy L. O'Ma___

21                             Timothy L. O'Mara

22                             505 Montgomery Street, Suite 2000
                               San Francisco, California 94111-6538
23                             Telephone:  +1.415.391.0600
                               Facsimile:  +1.415.395.8095
                               tim.o'mara@lw.com

24                             *Attorneys for Defendants Ticketmaster*
25                             *L.L.C. and Live Nation Entertainment,*
                               *Inc.*

26

27  ────────────────
    case have *anything* to do with the conditional license granted to *these* named
28  Plaintiffs, neither of whom claim that they ever tried to or did engage in any use
    forbidden by the license.